## UNITED STATES v. PAN–AMERICAN PETROLEUM CO. et al.

(District Court, S. D. California, N. D. May 28, 1925.)

**1. Fraud ⟷58(1)—Clear and convincing proof essential.**

False representations or pretenses must be established, whether by direct or circumstantial evidence, by clear and convincing proof.

**2. Conspiracy ⟷1—Nature and essentials of "conspiracy."**

A "conspiracy" is a combination of two or more persons to effect an illegal object as an end or means, and joint purpose or intent need not be to commit a crime, or even unlawful act, if it is intended to accomplish the act by surreptitious or unlawful means, especially

when object is to effect contract with government officer.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

**3. Mines and minerals ⟷5—Conspiracy sufficiently proved in suit to annul leases and contracts, if probability favors conspiracy.**

In suit by the government to cancel oil and gas leases and contracts to exchange royalty oils for fuel oil and storage facilities, on ground of fraud and conspiracy, though conspiracy charged contains elements of a criminal conspiracy, it is sufficiently established if the greater probability is in favor of the existence of the conspiracy.

**4. Conspiracy ⟷19—Inference must be reasonable, probable, and unstrained.**

If the issue of fraud or conspiracy in a civil suit is dependent on circumstantial evidence, the inference of fraud or conspiracy must be reasonable, probable, and unstrained.

**5. Conspiracy ⟷9—"Conspire to defraud the United States" defined.**

To "conspire to defraud the United States" means primarily to cheat the government out of money or property, but also means to interfere with or obstruct lawful governmental functions by deceit, craft, or trickery, or dishonest means, and, to annul government contract for conspiracy, property or pecuniary loss is not necessary, if legitimate official action and purpose has been defeated by misrepresentation, chicane, or overreaching of government agents.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspire.]

**6. Mines and minerals ⟷5—When government may maintain suit to annul leases stated.**

The government may maintain a suit to annul oil and gas leases of public lands, when it has an interest in the remedy sought, by reason of an interest in the land, when fraud has been practiced on the government and operates to its prejudice, or when the duty of the government requires such action.

**7. Mines and minerals ⟷5—Leases and contracts obtained by fraud held to involve pecuniary injury to government.**

Oil and gas leases covering naval petroleum reserve obtained by fraud, and contracts similarly obtained for exchange of royalty oils for fuel oil and storage facilities, *held* to involve pecuniary injury or loss to the government, so as to support suit for cancellation, where the government thereby parted for 15 years, at least, with the products of its naval oil reserve, and lost its right to make more favorable contracts and leases.

**8. Mines and minerals ⟷5—Government entitled to cancellation of leases of naval reserves obtained by fraud.**

Fraud, undue favoritism, and misconduct on part of government officer *held* to entitle the government, apart from pecuniary injury, to cancellation of oil and gas leases, covering naval petroleum reserve and contracts for ex-

change of royalty oils for fuel oil and storage facilities.

**9. Mines and minerals &#9758;5—Personal gain to Secretary of the Interior held to involve pecuniary loss.**

As Secretary of the Interior, in leasing naval oil reserves and contracting for exchange of royalty oils for fuel oil and storage facilities, was acting as a trustee, any private benefit received by him constituted pecuniary loss to the government, supporting suit for cancellation or rescission, especially in view of Joint Res. Cong. Feb. 8, 1924, declaring such leases and contracts against the public interests.

**10. Mines and minerals &#9758;5—Evidence held to show secret agreement, pursuant to which oil leases granted.**

In suit to cancel oil and gas leases covering naval petroleum reserve, and contracts for exchange of royalty oils for fuel oil and storage facilities, evidence *held* to show secret fraudulent agreement between the Secretary of the Interior and controlling officer and stockholder of the lessee corporation, and that contracts and leases resulted from such secret understanding and agreement.

**11. Mines and minerals &#9758;5—Payment to government officer during negotiations for oil leases held to require their cancellation.**

The payment of $100,000 to the Secretary of the. Interior by the principal officer and stockholder of certain oil companies while he was negotiating on their behalf for oil and gas leases, covering naval petroleum reserves and contracts for the exchange of royalty oils for fuel oil and storage facilities, *held* to entitle the government to cancellation, whether such payment was made as a bribe, a gift, or a loan.

**12. United States &#9758;68—Contract canceled when contracting officer receives money from contractor.**

Where simultaneously and concurrently with negotiations with a governmental officer for a public contract, the officer clandestinely receives and accepts a substantial amount of money from the person or concern with whom he is negotiating, and who later receives the public contract containing valuable rights to him or his principal, the safest salutary and correct rule is to abrogate, annul, and set aside the contract as contra bonos mores and against public policy, whether the money transaction is a loan, a gift, or a bribe, as it is impossible to say to what extent the contract and the officer's official acts were influenced by the money transaction.

**13. Mines and minerals &#9758;5—Evidence held to show Secretary of the Interior controlled award of oil leases.**

In suit to cancel oil and gas leases covering naval petroleum reserves on ground of fraud and conspiracy between the Secretary of the Interior and principal officer and stockholder of the lessee corporation, evidence *held* to show that the Secretary of the Interior was the dominant and deciding agency in the making of the contracts, and settled the question of what leases should be given and what royalties exacted.

**14. Mines and minerals &#9758;5—Evidence held to show competitive bidding on contract was sham and pretense.**

In suit to cancel oil and gas leases and contracts for exchange of royalty oils for fuel oil and storage facilities, evidence *held* to show that the first of such contracts was not let on fair competitive bidding, but that the competition was a sham and a pretense, by reason of the favoritism shown the successful bidder.

**15. United States &#9758;64—Bidders on contract must be treated without discrimination or partiality.**

There is no competition in bidding on a government contract, unless the bidding is done on the same basis, and the bidders must be given the same information, and there must be no discrimination or partiality.

**16. United States &#9758;64—Alternative proposals from bidders should be defined.**

When alternative bids on a government contract are called for, the alternatives that would be considered should be defined, so that bidders may understand them and a comparison of the relative merits and values of the bids may be made.

**17. United States &#9758;64—Letting of contract to successful bidder held to involve pecuniary damage to government, justifying cancellation and rescission.**

Where, in connection with bids for construction of storage facilities and furnishing of fuel oil to government in exchange for royalty oil, favoritism was shown the successful bidder, he was given a contract containing the preferential right to leases of naval petroleum reserves, and the other bidders were not informed that he had secretly agreed to do the construction work at cost, there was sufficient pecuniary damage to the government to justify cancellation and rescission.

**18. United States &#9758;64—Acceptance of proposals and award of contract held to create enforceable contract.**

Where, in response to invitation for bidders, proposal for construction of storage facilities and delivery of fuel oil in exchange for royalty oil had been submitted, by which bidder offered to do work at cost in consideration of preferential right to oil leases, if granted, and proposal was accepted and contract awarded, there was then enforceable contract, and the government was under no obligation to give any specific leases to secure execution of formal contract.

**19. Mines and minerals &#9758;5—United States &#9758;66—Fraud in one contract held to infect leases and another contract.**

Where contract to construct storage facilities and furnish fuel oil in exchange of royalty oil with preferential right to leases, covering naval petroleum reserves, was tainted with fraud, leases granted under such preferential clause and contract for construction of further facilities and further exchange of oils *held* also infected with fraud.

**20. Mines and minerals** ⬤⟿2—**Statute as to development of naval reserves held remedial, and to be liberally construed.**

Act June 4, 1920, directing Secretary of the Navy to take possession of naval petroleum reserves and conserve; develop, use, and operate them, being remedial is to be liberally construed, and so as to effectively accomplish the legislative purpose.

**21. Statutes** ⬤⟿181(1)—**Matters to be considered in ascertaining intent stated.**

In construing a statute, intention of the Legislature and ill intended to be remedied must be ascertained, and in ascertaining such intention the court may look to prior and contemporaneous acts, the reason which induced the act in question, the mischief to be remedied, the extraneous circumstances, and the purpose intended to be accomplished.

**22. Mines and minerals** ⬤⟿2—**Language of act as to development of naval petroleum reserves to be given ordinary meaning, in absence of contrary intent.**

In absence of clear necessity to contrary, language of Act June 4, 1920, relative to development of naval petroleum reserves, must be interpreted and applied in its ordinary usage and meaning.

**23. Mines and minerals** ⬤⟿5—**Secretary of the Navy authorized to "exchange" royalty oils under leases for fuel oil and storage facilities, at points away from reserves.**

Under Act June 4, 1920, authorizing Secretary of the Navy to develop naval petroleum reserves, and to use, store, exchange, or sell products thereof, the Secretary is authorized to contract for exchange of royalty oils due the government under leases for fuel oil and storage facilities, at points other than points on such reserves, especially in view of Leasing Act Feb. 25, 1920, §§ 18, 36 (Comp. St. Ann. Supp. 1923, §§ 4640¼i, 4640¼rr), as an "exchange" is a contract by which parties mutually give or agree to give one thing for another, neither or both of which is money only.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Exchange.]

**24. United States** ⬤⟿70(1)—**Contracts held for "exchange" of royalty oils for fuel oils and storage facilities.**

Contracts with government, whereby contractor agreed to furnish specified quantity of fuel oil and storage facilities therefor at specified points, in consideration of specified quantity of crude oil from naval petroleum reserves, held to provide an "exchange" of oil, within Act June 4, 1920, despite provisions for change of quantities in case of changes in market prices.

**25. United States** ⬤⟿66—**Option of government to take payment in cash held not to vitiate contract of exchange as a whole.**

Where government contracts provided for furnishing by contractor of fuel oil and storage facilities in exchange for royalty oils due the government, provision of one of such contracts for payment in cash at option of the government, after specified portion of the contracts had been carried out, if destroying the ex-

change feature of the contract containing it, held, not to vitiate the contracts as a whole.

**26. Exchange of property** ⬤⟿1 — **"Exchange" remains such, though subject-matter given a money value.**

An "exchange" is always an "exchange," when things other than money are transferred in consideration of other such things, though either or both be given a money value by the parties.

**27. Mines and minerals** ⬤⟿2—**President unauthorized to confer powers of Secretary of the Navy as to naval petroleum reserves on Secretary of the Interior.**

If executive order of the President committing the administration and conservation of naval petroleum reserves to the Secretary of the Interior, subject to the supervision of the President, was intended to confer on the Secretary of the Interior the authority lodged by Act June 4, 1920, in the Secretary of the Navy, it was to that extent void, as beyond the power of the President.

**28. Mines and minerals** ⬤⟿2—**Secretary of the Navy cannot delegate or transfer power over naval reserves.**

The Secretary of the Navy cannot delegate or transfer discretionary powers concerning development of naval petroleum reserves exclusively reposed in him by Act June 4, 1920.

**29. Mines and minerals** ⬤⟿5—**Leases held void, as vesting in Secretary of the Interior powers conferred upon Secretary of the Navy.**

Oil and gas leases, covering naval petroleum reserves and contracts for exchange of royalty oils for fuel oil and storage facilities, with provision for preferential grant of leases to the contractor, held void because vesting in the Secretary of the Interior powers concerning the supervision of the work and the granting of leases vested by Act June 4, 1920, in the Secretary of the Navy.

**30. Cancellation of instruments** ⬤⟿59—**Court empowered to do equity, though plaintiff does not offer to do so.**

In suit to cancel government contracts and oil and gas leases, although plaintiff in its bill makes no offer to do equity in the premises, the court has inherent power to administer equity between the parties, commensurate with special circumstances and conditions of the case.

**31. Mines and minerals** ⬤⟿5—**On cancellation of oil leases and contracts government required to pay for work done.**

In suit by the government to cancel oil and gas leases, and contracts for exchange of royalty oils for fuel oil and storage facilities, for fraud, where it appears that the contractor has expended money in constructing and completing storage facilities on government property, under supervision and inspection of government officers, and in drilling wells and producing oil, the government will be required to pay the cost price of such storage facilities and such fuel oil contents as have been delivered, and the amount actually expended in drilling and putting wells on production.

In Equity. Suit by the United States against the Pan-American Petroleum Company and another. Decree for plaintiff.

Atlee Pomerene, of Cleveland, Ohio, and Owen J. Roberts, Sp. Counsel, of Philadelphia, Pa., and Joseph C. Burke, U. S. Atty., and Robert B. Camarillo, Asst. U. S. Atty., both of Los Angeles, Cal., for the United States.

Frederic R. Kellogg, of New York City, Frank J. Hogan and Joseph J. Cotter, both of Washington, D. C., Henry W. O'Melveny, Walter K. Tuller, Charles Wellborn, Olin Wellborn, Jr., and Olin Wellborn, III, all of Los Angeles, Cal., Marc F. Mitchell, Dean Emery, of New York City, and Harold Walker, of Washington, D. C., for defendants.

McCORMICK, District Judge. This is a suit in equity, wherein the United States of America seeks to have declared null, void, and of no effect two contracts, dated April 25, 1922, and December 11, 1922, respectively, and two oil and gas leases to lands in the naval petroleum reserves in California, dated June 5, 1922, and December 11, 1922, respectively. The prayer of the bill is that these agreements and leases be canceled, for an accounting, and for general relief. The relief is sought upon two grounds: First, fraud in the making of the contracts and leases; and, second, lack of legal authority for their making.

The case has received the careful consideration that its importance demands, but existing circumstances, due to pressure and volume of work in the court, do not admit of the preparation of a detailed opinion upon every issue. The formal decision upon all issues consists of the findings of fact and conclusions of law filed herewith. I feel impelled, however, to amplify such decision by this statement.

I will first consider the charge of fraud and official misconduct in the making of the contracts and leases in suit; and, secondly, whether the agreements were made pursuant to any legal authorization. The first involves mixed questions of law and fact, while the latter is solely a legal question. The contracts and leases in suit may be epitomized as follows:

The agreement of April 25, 1922, is between the Pan-American Petroleum & Transport Company, a corporation, called the "contractor," and the United States of America, by the Acting Secretary of the Interior and the Secretary of the Navy thereof, denominated the "government."

It recites "that by virtue of authority contained in and the policy expressed by applicable acts of Congress, and in accordance with 'Proposal B' of the contractor, dated April 14, 1922, the parties hereto have mutually covenanted and agreed with each other as follows":

Article I—The contractor, for the consideration mentioned in the contract, and under the penalty of a bond of $250,000, agrees to faithfully and fully furnish 1,500,000 barrels of fuel oil and storage facilities for said fuel oil, which the contractor also agrees to construct at Pearl Harbor, territory of Hawaii, in accordance with "Proposal B" and plans and specifications to be furnished by the government.

Article II—Declares the intention of the parties is to effect an exchange of crude oil unsuitable for Navy use for fuel oil, the crude oil being produced from naval petroleum reserves Nos. 1 and 2, in California, and being property of the government, and the fuel oil to be delivered by the contractor at the naval station at Pearl Harbor, territory of Hawaii.

Article III—The contractor covenants to furnish the 1,500,000 barrels of fuel oil and to deliver such oil into storage facilities, to be constructed and erected by the contractor for a lump sum, of 5,878,905 barrels of crude oil from naval petroleum reserves Nos. 1 and 2 "of from 14 to 17.9 degrees (Baumé) gravity, or crude oil in such other quantity and quality as shall be of equal value, which lump sum is termed the 'proposal sum.'" Article III further provides: "It is hereby mutually understood and agreed that said 'proposal sum' is based upon the November-December, 1921, published field price of California crude oil of from 14 to 17.9 degrees (Baumé) gravity ($1.10 per barrel), which for the purposes of this agreement shall be termed the 'reference price of basic crude oil,' and upon the November-December, 1921, market price of fuel oil at Bay Point, Cal. ($1.50 per barrel), which for the purposes of this agreement shall be termed the 'reference price of fuel oil.'" Then follows a clause that deals with the change of gravity of oils, in which computations and allowances are made under the contract, dependent upon the variations in the market prices of crude and fuel oil during the life of the contract, and provision is made for the acceptance of "basic crude oil" of other gravity, which is termed "particular crude oil." It is provided

that, if delivery of "particular crude oil" is made under the contract, certain debits and credits will be extended at the ratio which the "published field price" of such "particular crude" on the date of delivery bears to the "reference price of basic crude." It is further agreed that any difference in debits and credits under the contract shall bear interest at the rate of 5 per cent. per annum, the interest to be allowed in barrels of basic crude oil.

Article IV—The government agrees to deliver to the contractor at the place of production each month "all the royalty oil that may be furnished by its lessees in reserves Nos. 1 and 2, until all claims of the contractor under the contract are satisfied."

Article V—Vests the Secretary of the Interior with exclusive discretion to grant additional leases on any lands he may designate in reserve No. 1, so as to maintain total deliveries of royalty oil under the contract at the approximate rate of 500,000 barrels per annum.

Article VI—Requires the government to deliver to the contractor on account of the "proposal sum" all royalty oil from reserves Nos. 1 and 2 which had been accumulated and was in storage at the time the contract was made.

Article VII—Requires the contractor to take the crude oil at the wells and bear every expense incident to its movement, and further requires the contractor to deliver the fuel oil in storage at Pearl Harbor, T. H., and to pay for the transportation of the fuel oil to storage, and permits the contractor to supply the fuel oil in storage in any amount it may elect, providing that the required contract amount be entirely furnished and delivered in storage within the time that the government has furnished sufficient royalty oil to pay for the contracted fuel oil and storage facilities.

Article VIII—Specifies how and where the fuel oil is to be gauged.

Article IX—Concerns the payment of demurrage in the event that the contractor's tankers are delayed in discharging fuel oil at Pearl Harbor, the calculation of demurrage being made in barrels of oil and added to the "proposal sum."

Article X—Relates to increasing or diminishing the "proposal sum" to meet the contingency of more or less or different concrete piles being required to provide the storage facilities at Pearl Harbor than are shown by the drawings and specifications.

Article XI—Confers the preferential right on the contractor, and covenants that "if, during the life of this contract, future leases shall be granted"—within a certain portion of reserve No. 1—"the contractor shall first be called upon by the Secretary of the Interior to meet such drilling conditions and to pay such royalties as the Secretary may deem just and proper, and in the event of his acceptance of such conditions, and of his agreement to pay such royalties, the contractor shall be granted by the government a preferential lease on such tracts as the Secretary of the Interior may decide to lease in the event of the failure of the contractor to agree to the conditions and royalties as proposed by the Secretary of the Interior, then said lease or leases may be offered for competitive bidding, but the contractor shall have a right to submit a bid on equal terms with others engaged in said bidding."

Article XII—Provides for the giving to the government of any saving in the cost of the construction of the storage facilities, should said cost be less than 3,197,086 barrels of "basic crude oil" at "reference price" thereof, such saving to be determined by agreement between the Secretary of the Interior and the contractor, and to be expressed by crediting such saving in barrels of "basic crude oil" on account of the "proposal sum."

The lease of June 5, 1922, was incidental to and in pursuance of the April 25, 1922, contract. It was granted at the request of the defendants and to enable the contractor to more speedily perform the said contract. It was given without competitive bidding and solely to effectuate the preferential right of article XI of the April 25 contract. The parties were the United States of America, acting through the Secretary of the Interior, and the Pan-American Petroleum & Transport Company, a corporation. It recites, inter alia, that it is made pursuant to authority of an act of Congress approved June 4, 1920 (41 Stat. 812), making appropriations for naval service and other purposes. It granted the exclusive right to drill for, extract, remove, and dispose of all oil and gas deposits in the northeast quarter of section 3, township 31 south, range 24 east of the Mt. Diablo meridian, California, for a period of 20 years, with a certain preferential right of 10 years additional. Certain drilling requirements are stated, and the royalties to be paid the government under the lease range from 12½ per cent. for 20

barrels or less per day to 45 per cent. for 400 barrels or more per day for oil produced of 30 degrees or over (Baumé), and from 12½ per cent. to 35 per cent. for oil of less than 30 degrees (Baumé). The lease also provides for payment of certain royalties for gas and casing-head gasoline produced from wells under the lease. There are other provisions which are of no particular consequence in the present inquiry.

The contract of December 11, 1922, was made between the same parties as the April 25, 1922, agreement, but was signed on behalf of the government by Albert B. Fall, Secretary of the Interior, in person. Its preamble recites the making of the contract of April 25, 1922, and the purposes and intent thereof—i. e., to effect an exchange of royalty crude oil from naval reserves for fuel oil in storage at Pearl Harbor, T. H., including tanks and incidental facilities—and that "it is now desired to fill said tanks as promptly as they are individually completed, and also to procure for the Navy additional amounts of fuel oil and other petroleum products in storage at Pearl Harbor, T. H., and elsewhere, and the Secretary of the Navy in his letter of November 29, 1922, * * * has requested the Secretary of the Interior, as administrator of the naval petroleum reserves, to arrange for such additional fuel oil and other petroleum products in storage through exchange therefor of additional royalty crude oil belonging to the government in said California naval reserves, the probable cost of the additional products and storage immediately planned for being estimated at $15,000,000, more or less." It states the willingness of the contractor to do the work and furnish the oil, and then continues: "And whereas, the furnishing of such additional amounts of fuel oil and other products in storage on the basis of exchange for the government royalty crude oils cannot be accomplished from the present leases in the California naval reserves." Mention is then made of the preferential right of the Pan-American Petroleum & Transport Company to leases in naval reserve No. 1, as provided in the April 25, 1922, contract, the agreement reciting that the contractor "is planning to provide refinery facilities at Los Angeles, Cal., for 10,000 barrels per day, to be increased to 20,000 per day as soon as the situation justifies, together with pipe lines connecting the leases in the field and the refinery and docks, and to erect storage to the amount of 2,000,000 barrels or more." Then follows:

Article I—Providing for a bond of $250,000 to insure compliance with the agreement, specifying E. L. Doheny as guarantor on said bond. Said article of the agreement continues in paragraphs substantially as follows:

(1) Makes provision for the contractor to furnish the fuel oil required under the April 25, 1922, contract, and to fill the storage tanks called for by said earlier contract when and as directed by the Secretary of the Interior.

(2) Provides for the construction at Pearl Harbor, T. H., of additional storage facilities up to 2,700,000 barrels at cost and without profit to contractor.

(3) Provides for the furnishing of fuel oil to fill the new construction and for charging the government for such fuel oil delivered at Pearl Harbor, T. H., at the Bay Point, Cal., market price plus the cost of transportation by tankers to the place of storage.

(4) Provides for the furnishing of other petroleum products than fuel oil and for filling the facilities to be constructed at Pearl Harbor, T. H., for such products under this contract at the contractor's current sales price. In no case, however, is the cost to the government for such products to exceed the then current prices under Navy contracts for similar products.

(5) Provides for furnishing without charge during the life of this contract storage for 1,000,000 barrels of fuel oil at Los Angeles, Cal., and for the filling of such storage with fuel oil to be exchanged for crude oil and placing the same in custody of the government, the said storage to be filled with fuel oil for the Navy as soon as the government royalty oil from the California naval reserves shall have paid for all work done and crude oil products furnished at Pearl Harbor, T. H. Contractor also agrees to bunker government ships from said 1,000,000 barrels of fuel oil at cost, and, further, to carry during the life of this contract all royalty oils derived from leases in naval petroleum reserves in California to the refinery or tidewater at Los Angeles, Cal., free from any pipe line charge.

(6) Contractor further agrees, for a period of 15 years from the date of this contract and subject to the Navy demands, to maintain 3,000,000 barrels of contractor's C grade fuel oil in certain storage depots

of contractor on the Atlantic Coast, and provides, further, that any part of said fuel oil will be allocated to the Navy on 30 days' written notice and held for not more than 6 months in storage for the Navy at one cent per barrel per month storage charges until and unless such oil is purchased or released by the Navy, such allocation, however, shall not be maintained more than six months, and it provides, further, "that if and when such oil is purchased by the Navy, contractor shall be paid therefor at market prices from current available Navy funds, and no charge shall be made against the government under this section except for and on account of oil so set aside."

(7) Contractor agrees to furnish at such points as the government shall designate a reasonable amount of crude oil products and storage facilities therefor similar to those agreed by this contract to be furnished at Pearl Harbor, T. H., when the royalty oils delivered by the government to the contractor shall have been sufficient to pay for the Pearl Harbor project pursuant to the contract of April 25, 1922, and also for the additional work and crude oil products in this contract agreed to be furnished.

(8) Gives the Navy the privilege of purchasing at 10 per cent. less than market price at tidewater any additional available fuel oil produced from government lands in the California Naval reserves which it might require above the amount which it is entitled to in exchange for its royalties, and provides further: "Said market price to be determined from time to time in such manner as may hereafter be agreed upon by the parties hereto, payment therefor to be made from current available Navy funds."

(9) Agrees to sell to the Navy certain manufactured petroleum products from the California refinery on the same terms as those specified in subdivision 8 hereof.

Article II—Recites: "For the considerations herein mentioned and contained, to wit, the furnishing of oils in storage and facilities and options as specified above, the government agrees:"

A. To sell and deliver all its royalty oil from Nos. 1 and 2 reserves, subject to its obligation to deliver enough thereof to pay out the contract of April 25, 1922, "until the government's obligations under this instant contract are discharged, and in any event for a period of 15 years from the date of the expiration of said contract

6 F.(2d)—4

of April 25, 1922, the government to be given credit by contractor for such crude oil delivered by the government at the published field price thereof on date of delivery and for such gas and casing-head gasoline at the prices and under the conditions fixed in the various leases, any surplus of government credits thus accruing are to be satisfied by delivery of fuel oil or other petroleum products, by construction of additional storage facilities, or to be payable in cash, as the government may at that time elect."

B. To lease, and does lease, pursuant to the formal written lease dated December 11, 1922, to the Pan-American Petroleum Company, a corporation, lands in naval petroleum reserve No. 1, described in the accompanying lease of said date, and consisting of approximately 32,000 acres.

Article III—Provides for the gauging of the oils, and further that any difference in debits and credits between the parties on account of crude oil received by the contractor, on the one hand, and expenditures made by contractor for storage facilities and crude oil products delivered by him, on the other, shall bear interest at the rate of 5 per cent. per annum, determined on monthly balances, and also provides that the interest provisions contained in the contract of April 25, 1922, shall cover fuel oil as well as construction.

The lease of December 11, 1922, is practically a lease to exhaustion of production of oil and gas on all of the then unleased portions of naval reserve No. 1, the term of said lease being expressed as "for a period of 20 years from the date hereof and so long thereafter as oil or gas is produced in paying quantities from said lands," at sliding scales of royalties ranging from 12½ per cent. to 35 per cent. for oil of 30 degrees Baumé or over, to from 12½ per cent. to 30 per cent. for oil of less than 30 degrees Baumé, the royalties increasing with the amount of oil produced per well.

This lease gives the Pan-American Petroleum Company the unrestricted right to drill and develop, except in the land within naval reserve No. 1 west of the range line dividing range 24 east and range 23 east M. D. M., but includes the right to drill and develop immediately the following sections west of said range line, to wit: Sections 24, 25, 26, and 35, in township 20 south, range 23 east M. D. M. It recognizes a certain agreement between the Secretary of the Interior and the Pacific Oil

Company restricting drilling upon certain portions of the leased area, but provides that upon request of the Pan-American Petroleum Company the Secretary of the Interior will give to the Pacific Oil Company the six months' notice provided for in said agreement, and provides that upon the expiration of such six months' notice the Pan-American Petroleum Company shall have the same rights with respect to drilling, etc., upon said lands as upon all other lands covered by the lease lying east of the range line dividing ranges 22 and 23, as aforesaid.

The amended bill of complaint avers material matters that are either admitted by the parties to this suit or have been so thoroughly proven by the evidence that there can be no question concerning them. Among these are the following: That from March 5, 1921, until March 4, 1923, Albert B. Fall was the duly appointed, acting, and qualified Secretary of the Interior of the United States of America; that during all times material to this controversy Edwin Denby was the duly appointed, qualified, and acting Secretary of the Navy of the United States of America; that during all times concerned in this controversy, and during all of the negotiations between officers of the government and the defendant corporations, Edward L. Doheny was the dominant and managing executive officer of the defendant corporations, and during such times was either the owner of or in control of a majority of the stock of said defendant corporations; that the Pan-American Petroleum Company is a wholly owned subsidiary corporation of Pan-American Petroleum & Transport Company.

The amended bill alleges that prior to May 31, 1921, Albert B. Fall obtained from the President of the United States, who acted pursuant to representations made by said Fall, but in good faith, a certain executive order, as follows:

"Executive Order.

"Under the provisions of the act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any naval petroleum reserve, authorizing the President to permit the drilling of additional wells or to lease the remainder or any part of a claim upon which such wells have been drilled, and under authority of the act of Congress approved June 4, 1920 (41 Stat. 812), directing the Secretary of the Navy to conserve, develop, use, and operate, directly or by contract, lease, or otherwise, un-appropriated lands in naval reserves, the administration, and conservation, of all oil and gas bearing lands in naval petroleum reserves Nos. 1 and 2, in California, and naval petroleum reserve No. 3, in Wyoming, and naval shale reserves, in Colorado and Utah, are hereby committed to the Secretary of the Interior, subject to the supervision of the President; but no general policy as to drilling or reserving lands located in a naval reserve shall be changed or adopted, except upon consultation and in co-operation with the Secretary or Acting Secretary of the Navy. The Secretary of the Interior is authorized and directed to perform any and all acts necessary for the protection, conservation, and administration of the said reserves, subject to the conditions and limitations contained in this order and the existing laws, or such laws as may hereafter be enacted by Congress pertaining thereto.

"Warren C. Harding.

"The White House, May 31, 1921."

Plaintiff avers that such order was void and of no force or virtue, and was known to be void by Albert B. Fall and Edward L. Doheny and the defendants in this case; that Fall knowingly, falsely, and for the unlawful purpose of enabling him, as the Secretary of the Interior, to effect a fraudulent transfer of rights in certain public lands to the defendant corporations controlled by Edward L. Doheny, had represented to the President that said order was proper, necessary, and for the best interests of the government and the public, and that all of said representations were false, fraudulent, and untrue, and at the time were so known to said Albert B. Fall.

The answer admits the making and promulgation of the executive order by the President in good faith, denies that defendants or Edward L. Doheny had any knowledge of its illegality or invalidity, and denies all allegations of fraud with respect thereto. There is no evidence in the case that Mr. Doheny or the defendant companies had anything to do with the making or procuring of the executive order.

No effort was made by the plaintiff to establish the charge of false representations by Secretary Fall to the President relative to the promulgation of said executive order by direct evidence, but it is contended that the circumstances of the situation sustain the charge. Mr. Fall was not called as a witness in this case by either party to the action. Mr. Doheny was called by the plaintiff, but when interrogated by counsel for plaintiff asserted and claimed his constitutional right,

and refused to testify because of the pendency of an indictment against him in the District of Columbia involving matters material to this case, and, counsel for plaintiff having conceded that such indictment was pending and undetermined, this court thereupon recognized Mr. Doheny's constitutional right to remain silent, and he did not testify further as a witness in this case. The only oral testimony concerning the obtaining of the executive order from President Harding was produced through a statement from Theodore Roosevelt, who during Secretary Denby's administration was Assistant Secretary of the Navy, and whose testimony will be noted later.

[1] The rule of law as to the degree of proof required to establish false representations or pretenses, whether by direct or circumstantial evidence, is that it must be established by clear and convincing proof. The original text of the executive order was prepared in the Interior Department. As early as the first part of May, 1921, and probably some time in the preceding month, Secretary Fall had spoken to Assistant Secretary of the Interior Finney of a plan he had in mind by which the Interior Department would undertake to administer some of the lands in the naval oil reserves, and at such time had asked Finney to give him a brief statement as to the applicable law. Mr. Finney prepared such a statement and expressed the opinion therein that under section 18 of the Oil Leasing Act of February 25, 1920 (41 Stat. 437 [Comp. St. Ann. Supp. 1923, § 4640¼i]), and the Act of June 4, 1920 (41 Stat. 812), "the President may commit to the Secretary of the Interior the matter of authorizing additional wells or leases under section 18 of the Leasing Act, and the Secretary of the Navy may, under authority of the Naval Appropriation Act cited (Act June 4, 1920), request the Secretary of the Interior to handle for the Navy the conservation, development, and operation of other lands in naval reserves. The royalties from existing leases and such other royalties as may be derived from future leases in naval reserves may be turned over to the Navy Department directly, or may be exchanged by the Secretary of the Interior, to the end that the Navy may have its equivalent in fuel oil."

After submitting this statement to Secretary Fall there was prepared in the Interior Department, probably by Mr. Finney, a letter, which was signed by Secretary Fall and sent to the Secretary of the Navy, as follows:

"Department of the Interior.

"Personal.          Washington, May 11, 1921..

"The Honorable The Secretary of the Navy—Dear Mr. Secretary: Referring to our conversation yesterday, and to your suggestion to the President that the Secretary of the Interior be placed in charge of administration of the laws relating to naval reserves, I am submitting herewith for your consideration a brief memorandum stating the facts and law with respect to naval reserves, a tentative form of letter for your signature if it meets with your approval, and a form of executive order for the President's signature, if it meets your suggestions of yesterday. Please consider the same and give me any criticisms or suggestions which may occur to you. If they meet with your approval, and no changes occur to you, kindly return them, with your approval, in order that the matter may be taken up with the President.

"Respectfully,

"[Signed]    Albert B. Fall, Secretary.

"Inclosure 19756

"(Initials ECF.)"

With this letter there was inclosed:

(1) The draft of a proposed letter from the Secretary of the Navy to the President, as follows:

"My Dear Mr. President: The Act of February 25, 1920 (41 Stat. 437), authorizes the Secretary of the Interior to lease producing wells in naval petroleum reserves, and authorizes the President to permit the drilling of additional wells or to lease the remainder or any part of any claim in such reserves, with preference right to the claimant or his successor. A clause in the appropriation act for the year ending June 30, 1921 (41 Stat. 812), authorizes the Secretary of the Navy to take possession of unappropriated lands within naval reserves, and to conserve, develop, use, and operate the same 'directly or by contract, lease, or otherwise.' To avoid conflict, delay, and duplication, it occurs to me that the matter may be best administered through one agency, and I have suggested that the Secretary of the Interior be directed, under your supervision, to administer all of the various provisions of law cited relating to naval petroleum reserves heretofore created by Executive order, the oil and gas accruing to the United States from the operation of any wells in said reserves to be utilized by and for the Navy, in accordance with the provisions of existing law. Under the authority vested in me by said appropriation act, I request and recom-

mend that you take the necessary steps to impose this duty upon the Secretary of the Interior. The details incident to this transfer of authority and to the disposition of the oil and gas produced will be arranged cooperatively between the Interior Department and this department.

"Sincerely,                    Secretary.
"The President, The White House."

And (2) the draft of a proposed executive order, as follows:

### "Executive Order.

"Under the provisions of the act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any naval petroleum reserve, authorizing the President to permit the drilling of additional wells or to lease the remainder or any part of a claim upon which such wells have been drilled, and under authority of the act of Congress approved June 4, 1920 (41 Stat. 812), authorizing the Secretary of the Navy to conserve, develop, use, and operate, directly or by contract, lease, or otherwise, unappropriated lands in naval reserves the conservation, development, use, and operation of oil and gas bearing lands in naval reserves Nos. 1 and 2, California, naval reserve No. 3, Wyoming, and naval oil shale reserves in Colorado and Utah, is hereby committed to the Secretary of the Interior, under supervision of the President, and he is authorized and directed to perform any and all acts necessary for the protection, administration, and development of the resources of said reserves, subject to the conditions and limitations of existing laws or such laws as may be hereafter enacted by Congress pertaining thereto.                    ————————.

"The White House, May ——, 1921."

The inclosed proposed letter from the Secretary of the Navy to the President was never signed by Denby and was never transmitted to the President. The Interior and Navy Departments later conferred and agreed upon the text of an executive order, and the revised form was personally taken and presented to President Harding by Theodore Roosevelt, Assistant Secretary of the Navy, and upon Roosevelt's statement to the President that the order in its then form was satisfactory to the Interior and Navy Departments it was signed by the President. There is no evidence in this case as to any further conversation or representation by Secretary Fall to President Harding relative to this executive order. Mr. Denby, although present throughout the trial, was not called as a witness.

While the plaintiff failed to substantiate the allegations in the bill of false representations by Secretary Fall to President Harding, there can be no doubt from the evidence that Secretary Fall was very active in the movement which eventuated in the transfer of the administration and control of the naval oil reserves from the Navy to the Interior Department, and he appears to have at all times dominated the situation relative thereto; the record in this case indicating that Secretary Denby was passive, and even complacent, in the matter. In one of his early conferences with the Navy Council, Mr. Denby stated that he was going to transfer control of the reserves to Secretary Fall because he considered the reserves "dynamite." This was his attitude throughout all of the transactions involved in this case. His participation in the making and executing of the agreements in suit was perfunctory, passive, and formal. Secretary Fall and Admiral Robison were the real, active, and efficient agents of the government in the negotiations which resulted in the contracts and leases in controversy. I am persuaded by an impartial consideration of the evidence to believe that Secretary Fall effectuated the idea of transferring the control of the naval oil reserves from that branch of the government to which they had been committed by Congress into his own hands.

The executive order, as prepared by Finney and as sent to the Navy Department, did bodily and wholly transfer the reserves to Secretary Fall for administration, protection, and development. When the draft was submitted to the Navy Department, it was objected to by Assistant Secretary Roosevelt, Admiral Griffen, and Commander Stuart, who felt very strongly that the transfer would be a mistake. Roosevelt communicated his and the naval officers' objections to Secretary Denby, and urged that the land be not transferred to the Interior Department. But Denby informed him that their protest was too late, as the transfer had been agreed to by the President, Secretary Fall, and himself. Roosevelt, after consultations with Admiral Griffen, who at that time was in charge of the naval oil reserves as Chief of the Bureau of Engineering of the Navy Department, suggested to Secretary Denby a modification of the proposed order. Secretary Denby told Roosevelt that, if he could obtain Secretary Fall's approval to the change, it would be satisfactory to him. Roosevelt personally took the matter up with

Secretary Fall, and Fall immediately assented to his suggestion. This action by Secretary Fall seems to negative bad faith, but I believe that Secretary Fall considered Secretary Denby's passivity tantamount to relinquishment. The concurrent and subsequent events in this matter confirm this belief.

The change suggested by Roosevelt was the insertion in the order of the following language: "But no general policy as to drilling or reserving lands located in a naval reserve shall be changed or adopted, except upon consultation and in co-operation with the Secretary or Acting Secretary of the Navy." Although Roosevelt was at first entirely opposed to the transfer, he was convinced later that, on account of the Interior Department being better equipped and organized to undertake the contemplated development of the naval oil reserves, it was proper and advisable to effect the transfer, subject to the vital reservation which was inserted in the executive order at his suggestion. It is clear that it was not the intention of the Navy to relinquish the control of its reserves to the Interior Department, and it is apparent that Secretary Fall's original intention contemplated unrestricted and unqualified transfer of the reserves from the Navy to the Interior Department.

The foregoing and other circumstances and events concurrent with and relative to the promulgation of the executive order cast doubt upon the motives of Secretary Fall in furthering this transfer, and, when viewed in the light of subsequent events and transactions with Mr. Doheny and others, irresistibly lead me to conclude that Secretary Fall had conceived plans at the time the executive order was obtained to carry on negotiations relative to the naval oil reserves at least partially for his personal gain and benefit. That he did later personally profit financially by the transfer is in my opinion clearly shown by the evidence and circumstances in proof in this case.

The essential allegations of the amended bill of complaint relative to the first ground of attack may be summarized as follows: That subsequent to May 31, 1921, Fall and Doheny agreed to bring about and to make oil leases on the naval oil reserves of the United States fraudulently, not in the public interests or in the nation's welfare, but secretly, by noncompetitive methods, and for the unlawful purpose of personal gain and profit to themselves; that in order to accomplish such unlawful purpose they also agreed to arrange and execute the contract of April 25, 1922, the lease of June 5, 1922, and the agreements of December 11, 1922, by secret, fraudulent, and discriminatory methods; that in furtherance of such purposes, and during the course of the negotiations concerning the said contracts and leases in controversy, Doheny secretly delivered to Fall $100,000 in lawful money of the United States; that the delivery of this said money was not only for the purpose of influencing Fall respecting the said contracts and leases in suit, and in furtherance of the alleged conspiracy, but that Fall's official action in the premises was influenced by such payment; and further that, regardless of such alleged conspiracy, such payment of money was of and in itself an act of such flagrancy and wrongfulness by Fall and Doheny as to vitiate and annul all of the contracts and leases in suit upon the ground of sound public policy.

[2] The defendants' answer denies generally and specifically any fraud or conspiracy in the making of the contracts or leases in suit, and avers that they were lawfully made and constitute binding agreements. A conspiracy is a combination of two or more persons to effect an illegal object as an end or means. It is not necessary that the joint purpose or intent of the actors be to commit a criminal or even an unlawful act. It is sufficient if their intent is to do or accomplish a lawful act by surreptitious or unlawful means. This is especially true when the object of the joint purpose of the actors is the formation or making of a public contract with an officer of the Government.

[3, 4] The conspiracy alleged in the amended bill, while not charged as a crime, contains the elements of a criminal conspiracy. This case, however, is a civil action, and not a criminal prosecution. It is not necessary that the conspiracy be proven to the same degree of certainty as would justify a conviction of Fall and Doheny, if they were on trial for criminal conspiracy. The conspiracy in this case has been sufficiently established to require cancellation of the contracts in suit, if and when, after a fair and complete comparison and consideration of all the evidence and circumstances in proof, the greater probability is in favor of the existence of the conspiracy alleged. If the issue of fraud or conspiracy in a civil suit is dependent upon circumstantial evidence, the inference of fraud or conspiracy must be reasonable, probable, and unstrained. In such event the conspiracy has been clearly proven.

[5] To conspire to defraud the United

States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention. Hammerschmidt v. United States, 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968.

The Supreme Court of the United States has uniformly enunciated the principle that in cases of conspiracy or agreement to defraud the United States the ultimate question is not whether the fraud practiced must have inflicted upon the government pecuniary loss, but that the injury is complete as far as the grievous wrong is concerned when the purpose and effect of the agreement or transaction is to defeat a lawful function of the government. Haas v. Henkel, 216 U. S. 462, 30 S. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112.

It is true that no civil action lies for a conspiracy, unless there be an overt act that results in damage to plaintiff; but the rule announced by the Supreme Court of the United States in the above-cited and other cases shows that in cases similar to the one at bar the damages referred to are not necessarily pecuniary loss. If the cases cited by defendants similar to United States v. San Jacinto Tin Co., 125 U. S. 273, 8 S. Ct. 850, 31 L. Ed. 747, can be considered to be in point here, there is nothing said by the courts in any of them that would deprive the United States in this suit from obtaining cancellation of the contracts in question, if fraud, official misconduct, or conspiracy, as alleged, has been proven, because by the contracts in suit the nation has been deprived of its control of its naval oil reserve, and, if such loss is attributable to official corruption, then the wrong done to the nation requires the surrender by the defendants of the governmental property so wrongfully obtained.

[6] In many of the cases cited by defendants the real party in interest was not the United States. Private parties were seeking to enforce essentially private rights in the name of the United States. The United States as a suitor, either in its governmental or proprietary capacity, was not interested in so far as its property right was concerned in the result of the suits, and hence in such cases was held to have suffered no injury. But all of these decisions establish the rule, which is peculiarly applicable in the case at bar, that the right to the remedy sought by the amended bill in this case exists when the government has an interest in the remedy sought by reason of the interest in the land, or when the fraud has been practiced on the government and operates to its prejudice, or when the duty of the government requires such action.

There has been no decision of the Supreme Court extending the rule of such cases as Hyde v. Shine, 199 U. S. 62, 25 S. Ct. 760, 50 L. Ed. 90, or United States v. San Jacinto Tin Co., supra, to suits in equity brought under a law similar to the Act of June 4, 1920, and it is very doubtful in my mind whether the rule of these cases can be applied here, because the act under which these contracts and leases were made is not a part of the public land laws of the United States, all of which were designed for the primary purpose of seeing that the lands which were open to settlement might be distributed among individuals, and might be availed of primarily for the benefit of individuals, and incidentally, of course, for the benefit of the United States by distributing the population and by offering inducements for citizens to go to various localities where but scant population existed. The naval reserves were never intended to be administered or controlled in the same manner or for the same purposes as other public lands. They were intended primarily and solely for the use and benefit of the United States Navy, and the law which guides the administration of the naval reserves stands alone, without any other statutes, and is the sole measure of the legislative intent with regard to the subject-matter thereof.

[7, 8] However, it cannot be said that the United States has not suffered injury or loss of a pecuniary nature by the fraud shown in this case. It has parted with, for a period of 15 years, at least, all' of the oil and petroleum products of its naval oil reserves. It has relinquished its right to make more favorable contracts and leases than those with the defendants. It has been prevented from obtaining more advantageous terms by competition for the leases. It has enabled the defendants to obtain royalty oil from other government lessees that the defendants have been selling to another oil company at a premium above market prices. But I do not base the right of the United States to cancellation and rescission of the contracts in suit as much upon the pecuni-

ary or money nature of the injury shown as upon the right of the United States to be restored to the use and possession of its naval oil reserves, where it has relinquished them to private enterprise because of fraud, undue favoritism, and misconduct of its officers.

The charge in this case does not concern so much pecuniary loss to the United States as it does the right of the United States to annul contracts by which the nation's naval oil reserves, set apart by Congress exclusively for governmental and national purposes, have been fraudulently and wrongfully obtained by private persons or bodies, through wrongful acts of government officers acting conjointly with such private persons or agents of private bodies.

[9] Any corrupt or unlawful arrangement or agreement in which an official of the government intentionally functions concerning public matters for his private and mercenary gain is an injury and damage to the government, regardless of whether pecuniary loss is sustained by the government. The nation, in leasing its naval oil reserves, does not assume the attitude of a mere bargainor of oil-bearing lands for a money value. These lands are held in trust for the United States, and the trustees—that is, the public officers—who administer and control them can do so only for the public welfare and in a manner designed to preserve the integrity of government. Secretary Fall was a trustee of the highest order in his transactions relative to the naval oil reserves. If a trustee is prompted to act, and does in fact act, because of personal and clandestine motives, and if by so acting he acquires private financial benefit, his beneficiary has sustained pecuniary loss; for it is only because of his fiduciary relationship that he is enabled to deal with the public property at all and his sole emolument for doing so is his salary. Whatever the $100,000 that was transferred to Secretary Fall by Mr. Doheny, the principal officer of the defendant corporations, may be called, and regardless of the question whether Mr. Fall would have obtained it if he had not been Secretary of the Interior of the United States, and at the time transacting public business as such with Mr. Doheny, the fact is that Secretary Fall did obtain it when he was Secretary of the Interior of the United States, and a trustee of the public lands of the United States, and when, as such, he was negotiating with Mr. Doheny concerning such lands; and the effect of such transaction, in and of itself, constitutes a serious injury and damage to the beneficiary, the United States of America.

Moreover, assuming that the right to cancellation and rescission does not ordinarily exist in a suit in equity upon the mere proof of conspiracy, or moral wrong, or breach of ethics, without further showing resultant pecuniary loss, it is questionable whether such doctrine applies in this particular suit. This action is sui generis. It is not brought under the ordinary existent processes of the law. It is specially brought. The Joint Resolution of Congress (volume 1, U. S. Stat. 68 Cong. §§ 1–6 [43 Stat. 6]) declares that "the said leases and contract are against the public interest and that the lands embraced therein should be recovered and held for the purpose to which they were dedicated," and not merely authorizes, but directs, that suit be instituted for the cancellation and annulment of the specific contracts and leases in suit.

It would seem, therefore, that the lawmaking power, with respect to these particular public contracts and leases, intended to and did consider their effect as so injurious and pernicious to public welfare and governmental integrity, and so inimical to the purposes for which the naval petroleum reserves were segregated from the public domain, as to single them out for special and extraordinary consideration by a court of equity. It appears that Congress has said that, if the fraud and misconduct is sufficiently legally proven, then, regardless of the ordinary rule of showing mere money damage, these contracts and leases should be annulled.

[10] Considering the evidence in this case under the foregoing principles of law, the allegations of fraud and resultant damage contained in the amended bill have been in general sustained. In my opinion it has been clearly shown that Secretary Fall and Mr. Doheny had secretly agreed that portions of the naval oil reserves were to be leased to companies controlled by Mr. Doheny by privileged, unfair, and discriminatory means, and that the contracts and leases in suit were and are the result of such secret understanding and agreement.

Before Mr. Fall became Secretary of the Interior, the naval oil reserves had been controlled by the Navy Department under the authority of the Act of Congress of June 4, 1920 (41 Stat. 812). It was only in compromise and settlement of claims concerning rights to public lands under preexisting laws that the Interior Department had any powers or concern with such re-

serves. Under the Leasing Act of February 25, 1920 (41 Stat. 437), the Secretary of the Interior did exercise certain rights with respect to royalty oils coming to the government from leases in the naval oil reserves; but neither that act nor any other law gave the Secretary of the Interior any power whatever to lease or otherwise develop naval reserve lands, except in cases of compromise of pre-existing placer mining claims.

The President of the United States, under the Leasing Act, supra, had a limited further power over naval reserve lands, but no general power. There was no general power or discretion vested by Congress in any officer or department to make such disposition or use of naval reserve lands, or of royalty oil accruing under leases of these lands, as might be best for the interests of either the Navy or of the United States, except under the authority of the Act of June 4, 1920, supra. Congress by this law intrusted to the Secretary of the Navy the conservation, development, use, and operation of these valuable and important public and governmental lands.

The legal aspect of this measure will be considered in another portion of this opinion, dealing with the second general contention of the plaintiff in this case. In the present consideration it is only necessary to advert to the Act of June 4, 1920, as manifesting a clear and unmistakable intention by Congress to repose exclusive control over the naval oil reserves in the Secretary of the Navy, pursuant to the terms of the act.

In line with the policy of the government, as expressed in said act, and in April, 1920, Secretary of the Navy Daniels had established in the Navy Department the Oil Fuel Office, and had detailed Commander H. A. Stuart thereto. This office was under direct and immediate control of the Secretary of the Navy, and continued to be so throughout the administration of Secretary Daniels, being carried over and continued under Secretary Denby until he, by an order dated October 18, 1921, transferred it to the Bureau of Engineering of the Navy Department, and made it immediately subordinate to and under the direct supervision of that bureau.

Friction and discord was manifested between Secretary Fall and the naval officers in charge of the reserves shortly after Secretary Fall assumed charge of the Interior Department, and this condition pevailed until, as I have stated, the Oil Fuel Office in the Navy was abolished and all matters pertaining to the reserves were assigned by Secretary Denby to the Engineering Bureau of the Navy. The Chief of this Bureau at the time was Admiral J. K. Robison, who had been detailed as such about October 1, 1921. Admiral Robison was a friend of Edward L. Doheny, and during the World War his son, Edward L. Doheny, Jr., had been a naval officer on a ship commanded by Admiral Robison, and a friendship and attachment thus formed had grown and increased between the Admiral and the Dohenys, until their relations at the time of Admiral Robison's detail as Chief of the Engineering Bureau of the Navy are best shown by the following letter, written by the Admiral when he assumed his new command:

"October 6, 1921.

"My Dear Mr. Doheny: I have wanted to write to tell you of the good fortune that has come to me. Because of the many ways in which you have indicated your friendship for me, I am sure that you will be glad. The President has nominated, I have been confirmed, and am now serving as Engineer in Chief of the Navy. It is a pretty good billet. As you know, it gives me control of large activities, rank while holding the office of Rear Admiral, and in particular it gives me responsibilities and authority in connection with the maintenance and upbuilding of our Navy that I am glad to assume. To have been selected from my fellows for this position is grateful; the principal joy that I get, of course, comes from the satisfaction of my family and friends. With best wishes for your future, and with affectionate remembrance of Mrs. Robison and myself to your family, I am,

"Most cordially yours,
"J. K. Robison,
"Engineer in Chief, U. S. Navy.
"Mr. E. L. Doheny, President, Mexican Petroleum Company, 120 Broadway, New York, N. Y."

In 1917, on an occasion when Mr. Doheny visited his son on board a warship commanded by Admiral Robison, the Admiral and Mr. Doheny had discussed casually the naval oil reserves, and Mr. Doheny had told Admiral Robison that, on account of drilling near the reserves by outside private parties, the oil was being drained off the reserve, and that it would not be long until there would be no oil left in the reserves. This was the only conversation or dealing between Admiral Robison and Mr. Doheny until after Admiral Robison was placed in charge of the reserves by Secretary Denby in October, 1921.

On October 9, 1921, Admiral Robison had a conference with Secretary Fall regarding the naval petroleum reserves. At this conference he learned of a letter concerning the reserves that Secretary Fall had written to Secretary Denby in July, which will presently be referred to. This was his first connection with the reserves. He had not at that time discussed the reserves with his chief, Secretary Denby. As the result of his conferences with Secretary Fall and others in the Interior Department, he found the opinion that the reserves were being rapidly depleted by drainage, and he then remembered the talk he had with Mr. Doheny in 1917. In conjunction with Secretary Fall he then set out to formulate and to execute some plan to exchange the crude oil in the reserves for fuel oil to be stored at different points.

Admiral Robison, when acting as aide to Secretary Denby in March, 1921, and later upon being detailed to the Engineering Bureau, manifested an ardent and patriotic desire to construct and supply a reserve oil fuel station at Pearl Harbor, Hawaii, and in general to adopt a program for the establishment and construction of reserve oil fuel stations for the Navy, in order to strengthen the national defense. After his conferences with Secretary Fall, his desire became more intense, and he then concluded, if possible, to use the royalty oil from naval reserves to build such stations, and to supply and store them with fuel oil for future naval use. The testimony of Admiral Robison and the circumstances in proof convince me that Admiral Robison had no ulterior motive or mercenary purpose in any of the transactions involved in this case.

This was an entirely new activity, and was one of doubtful legal authority. There was a serious question at that time in the minds of Secretary Fall, Admiral Robison, Mr. Doheny, and every other person who discussed or contemplated the subject as to whether the right to establish reserve oil fuel stations existed without further legislation. It was then doubtful in the minds of all whether the Act of June 4, 1920, was broad enough to authorize the program. Up to this time the royalty oil due the United States from leases in the reserves had been either sold outright and the money deposited in the Treasury, or this oil had supplied merely current naval needs. It was Admiral Robison's fervent purpose to carry out this new project, if possible, and to do so without going to the Congress for further legislative authorization.

Admiral Robison and the Dohenys visited socially, and discussed the naval oil reserves and the proposed Pearl Harbor project as early as December, 1921, and Mr. Doheny told Admiral Robison during this time that his company would bid on the Pearl Harbor project, and that its bid would be one that would not involve one cent of profit to him or to his company. Admiral Robison, in his enthusiasm over the possibility of accomplishing his desire to strengthen the national defense, told Secretary Fall of Mr. Doheny's promise. Secretary Fall, however, had previously seen and talked with Mr. Doheny regarding the plan of using royalty oil for tankage, and it is clear that Mr. Doheny was already favorable to the plan, and had told Secretary Fall that he would make a bid thereon and that his bid would be at cost.

That Secretary Fall conceived the plan of exchanging the royalty oil due to the United States from leases on the naval petroleum reserves for fuel oil in storage tanks, and had suggested to Secretary Denby, long before Admiral Robison became connected with the plan, that he (Fall) would undertake to effectuate the idea, if Denby was willing, is positively shown by these two letters:

"Department of the Interior.

"690–6       Washington, July 23, 1921.
"13668–84:278

"Hon. Edwin Denby, Secretary of the Navy—Dear Mr. Secretary: In connection with the recent authorization to the Pan-American Petroleum Company and the United Midway Oil Company to drill 22 offset wells in naval petroleum reserve No. 1, California, I would like to be advised, as promptly as possible, what arrangements the Navy desires to be made for the handling and disposition of its royalty oil from said wells, as well as from any other wells in naval reserves, to which the Navy is entitled to royalty in kind. As the lease provides that purchasers will take care of the oil only for a limited period, it is important that provision be made to dispose of same promptly. I suggest the desirability of effecting an exchange of the crude oil received as royalty for an equivalent value of fuel oil, to be stored without expense to the United States by the other party to the exchange. Preferably the exchange should be, not only of crude oil for fuel oil in storage, but for the tanks containing the Navy's stored oil. In other words, my suggestion is that the crude oil be exchanged for tanks and fuel oil, the

title to both to be vested in the Navy as a result of the exchange. If this plan meets with your approval, and you desire me to undertake to consummate the arrangement, I shall be glad to do so. In any event, I should like to hear from you on the subject as soon as possible.

"Sincerely,

"Albert B. Fall, Secretary."

"Washington, July 29, 1921.

"My Dear Mr. Secretary: Replying to your letter of the 23d of July, I am glad to acquiesce in the suggestion made by you. It will be of great benefit to the Navy to have the royalty crude oil from wells on the naval reserves (both those already in operation and those to be drilled by the Pan-American Petroleum Company and the United Midway Oil Company) exchanged for fuel oil at tidewater, to be stored, if practicable, without expense to the government, and, if possible, for tanks in which such fuel oil can be stored. As the Navy has no appropriation to pay for the cost of construction of tank storage, the acquisition of tanks by exchange for crude oil from naval reserve wells will be most acceptable. While these tanks could be readily utilized at any point at tidewater, the usefulness to the Navy would be increased if they could be located at any one of the following points: San Diego, San Pedro, San Francisco Bay, Puget Sound, Honolulu, or Pearl Harbor, Hawaii. In view of the greatly reduced amount available under the appropriation 'Fuel and Transportation' for the present fiscal year, it would be of special benefit to the Navy to obtain royalty fuel oil at this time, as such oil would not involve a charge against this appropriation.          Edwin Denby."

This correspondence comes with significant swiftness after a notable letter written by Secretary Fall to Mr. Doheny on July 8, 1921, which will be referred to presently, and which is indicative of conferences and negotiations between Secretary Fall and Mr. Doheny, wherein plans for future drilling of the reserves were discussed between the two men. And it is a fair inference from this correspondence that they had at such times discussed the precise matter that is the central feature of the contracts and leases in suit, to wit, the leasing of the naval oil reserves and exchanging the oil therefrom for fuel oil in storage tanks.

The contention of defendants that the leasing of naval reserve No. 1, which was accomplished through the contracts and leases in suit, was not the act of the Interior Department, but was done by the Secretary of the Navy, has little merit, when viewed by the light of the evidence. Not only is it shown that Secretary Fall initiated the idea and suggested its accomplishment to Secretary Denby, but Secretary Denby, as I have previously stated, showed early in the negotiations and throughout a disinclination and an unwillingness to participate in the negotiations in any active way. There is no doubt in my mind that he intended to and did relinquish real control of further leases in the reserves to Secretary Fall. At a meeting of the General Council of the Navy, which has been previously adverted to, held October 18, 1921, Secretary Denby stated that, unless there was objection, he would transfer all of the fuel oil activities theretofore carried on under his office over to the Bureau of Engineering, and that he wanted the Interior Department to handle the leases for the best interests of the Navy, saying: "That matter of leasing is most difficult and dangerous thing to be done. It is full of dynamite. I don't want to have anything to do with it."

The evidence in this case shows that by October 25, 1921, both Secretary Fall and Admiral Robison had agreed upon the adoption of a policy whereby royalty oil should be bargained for tankage and its contents of fuel oil at Pearl Harbor, and that they had further agreed at that time that any negotiations relative to the carrying into effect of such policy were to be kept secret, so that their intentions could not be thwarted by congressional interference or become generally known to the public. The contention of defendants that the secrecy which attended all of the negotiations leading up to the contract of April 25, 1922, and of December 11, 1922, were because of Navy war plans is in my opinion not sustained. Even if the Pearl Harbor construction was such as to require secrecy, the oil leases in the naval reserves demanded no such safeguard. The secretive manner in which these leases were made cannot be justified by any war emergency plan.

Admiral Robison presented the matter of his negotiations and conferences with Secretary Fall to Secretary Denby, and procured from him a letter to Secretary Fall, as follows:

"October 25, 1921.

"My Dear Mr. Secretary: Rear Admiral Robison reported to me that as a result of his interview with you on Saturday, October 22, the following general agreement in connection with the naval petroleum reserves was reached:

"(1) That arrangements will be made by the Interior Department to have naval petroleum reserves Nos. 1 and 2 drilled with offset wells in every case where adjacent property is drilled.

"(2) That the amount of drilling, with consequent exhaustion of the reserves, shall be kept as low as practicable, without risking the depletion of the reserves by other parties.

"(3) That the equivalent of all royalty oil shall be delivered to the Navy in the form of fuel oil at such points on the Pacific Coast as may be found necessary for naval use, and that this exchange of crude oil for fuel oil will be effected on as favorable terms as it is possible to obtain. It is presumed that under favorable circumstances and terms arrangements may be made for including points on the Atlantic Coast for the delivery of an equivalent supply of fuel oil to the Navy.

"(4) That the equivalent of so much of the royalty oil as is not used by the Navy is to be devoted to the construction of oil storage at Pearl Harbor, Hawaii, and at other points to be hereafter designated by the Navy Department, the cost of the tanks to be credited to the royalty due the Navy.

"(5) That the Interior Department will exercise its best efforts to obtain for the Navy as large royalties and as favorable terms as practicable by public competition or otherwise.

"(6) That the terms for conversion of the crude oil at the well to fuel oil at tidewater or in tanks to be provided by the lessor will be submitted to the Navy Department for approval of the qualities, deliveries, engineering, and other features involved.

"(7) That all leases and contracts, except as provided in paragraph 6, will be arranged and consummated by the Interior Department, copies of same being furnished to the Navy Department as a matter of information and record only.

"(8) That every effort will be made by the Interior Department to expedite the solution of this problem, so that fuel oil at Pacific tidewater in exchange for royalty crude oil may be delivered as soon as possible to naval vessels, and so that the erection of suitable storage facilities for 1,500,000 barrels of fuel oil at Pearl Harbor may be undertaken and expedited.

"(9) That the development of naval petroleum reserve No. 3 is not to be undertaken, except to protect the government against depletion of the reserve by other parties.

"(10) The general intent of this agreement is to transform royalty oil into either (a) fuel oil for current naval use, or (b) fuel oil stored where required by the Navy as a reserve; the storage, of course, to be naval property and to accord with naval requirements.

"In accordance with the foregoing understanding, there is returned herewith letter from the Interior Department concerning leases that it is proposed to enter into with certain parties in naval petroleum reserve No. 1. Such details are, under the foregoing announced policies, to be left entirely to the Department of the Interior. Information is requested as to whether the foregoing policies are in all respects agreeable to the Department of the Interior, and also when it may be expected that the Navy Department will begin to receive fuel oil as part of its royalties.        Edwin Denby."

This letter was prepared by Admiral Robison in collaboration with Secretary Fall. It contains no direct reference to an intention to grant further additional leases in the reserves to provide more royalty oil with which to build tankage at Pearl Harbor, although at about the time that it was written Secretary Fall and Mr. Doheny had discussed the granting of additional leases as a consideration for the Pan-American Petroleum & Transport Company taking the Pearl Harbor contract. It seems apparent that Admiral Robison was not then aware of that vital and valuable part of the understanding and arrangement that had been developed by Secretary Fall and Mr. Doheny regarding the naval oil reserves.

I am satisfied that Secretary Denby, in sending this letter, did so believing that it was necessary in order to prevent present drainage from the naval oil reserves. The tenor of the letter so indicates. And I am also convinced that there was no present or threatening danger of such drainage, because the government had made sufficient offset and defensive leases to protect the reserves from drainage at that time. In my opinion, the contracts and leases involved in this suit were not made or intended by Secretary Fall, Admiral Robison, or Mr. Doheny as necessary imminent relief measures for the naval oil reserves.

Secretary Fall answered the letter on October 30, 1921, by stating that he would carry out the suggestions and intentions of the Navy Department. The October 25 letter gives much power and wide discretion to the Interior Department regarding oil leases in the reserves, and really confers the powers on that department which Secretary Fall had intended to acquire by the executive order of May 31 before Roosevelt's amendment. The aspect of the project covered by the October 25 letter that specially interested Secretary Fall was the leasing of the naval oil reserves. The paramount interest of Admiral Robison was the building and equipping of the Pearl Harbor reserve fuel station. By this coalescence of interest the two men worked to attain the same end, but through entirely different motives.

Secretary Fall and Mr. Doheny had been friends for 30 years. They had been associates in mining ventures in New Mexico in early days. An attachment had grown up between them that is experienced only by men who pioneered and prospected together in quest of fortune in the fastness of the mountains and deserts of the great West. They had been separated for some time. Fall had remained in New Mexico and had entered public life. Doheny had gone to California and had engaged in the oil industry. Fall had been unsuccessful in accumulating money. He was a prominent, but a poor, man. Doheny, on the other hand, had been prosperous and had become wealthy. While the strong friendship of the early days in New Mexico had extended over the years that had intervened, the two men had seen little of each other until Fall became Secretary of the Interior. The record in this case is silent as to any business or money transactions between these two men until Fall assumed the Cabinet office. In this official position, having much to do with oil-bearing public lands, naturally the early intimacy was revived and renewed, so that Secretary Fall and Mr. Doheny and their families saw much of one another during the summer and fall of 1921, frequently visiting at Washington, New York, and elsewhere. It is not only unnatural and unreasonable to infer that at these meetings they had no discussions concerning the nation's oil lands, but, as previously stated, there is positive evidence in this case that they had discussed using royalty oil for tankage and also the proposed Pearl Harbor project during the months of October and November, 1921, and they probably had discussed the matter much earlier in that year.

In July, 1921, a lease to drill offset wells along the north and east lines of section 1, township 31 south, range 24 east, Mt. Diablo meridian, being part of naval oil reserve No. 1 in California, was given by the Interior Department to the Pan-American Petroleum Company. This lease was essentially defensive, being necessitated by drilling activities of private owners of adjacent oil lands outside of the reserves, and was granted in conformity with the established policy that existed and was pursued until Secretary Fall obtained control of the naval oil reserves. I have adverted to this old policy of the Navy that its oil reserves should be kept underground, and that no leases to drill in the reserves should be given unless such were or appeared to be imperative to prevent drainage. Such was not only the policy of all previous administrations, but was also Secretary Denby's personal attitude throughout all of these transactions in which he took part. This lease of July, 1921, was awarded to the Pan-American Petroleum Company after competition, and the royalty thereof was 55½ per cent.

After the lease had been in operation some time it developed that the production thereunder was insufficient to justify the high royalty thereof, and the Pan-American Petroleum Company applied for a reduction. Its petition for relief was filed November 22, 1921, and although it was denied any reduction of royalty, nevertheless it was given other leases in reserve No. 1 at reduced royalties, to wit, from 12½ per cent. to 25 per cent. This transaction, in my opinion, had no direct relation to the Pearl Harbor matter, or the granting of additional leases in the naval oil reserves with which to pay for the Pearl Harbor project. It was solely a compromise arrangement arising out of the lease of July 12, 1921. The transaction, however, was handled and concluded under the personal direction of Secretary Fall.

When this lease of July 12, 1921, was signed by Secretary Fall, he wrote a letter to Mr. Doheny, in which he showed in no uncertain terms his determination to handle the naval reserves as he desired. This letter reads:

"July 8, 1921.

"My Dear Colonel: I desire to express to you my very sincere appreciation of your generosity and patriotism in surrendering a portion of your lease bid in naval reserve No. 1. I have settled the matter to-day, and have signed your leases, sending them over to you by Mr. Cotter. I filed with the President a letter explaining this entire situation,

and the conclusions reached and action which I had taken.

"In this letter to the President, among other things, I said: 'Thus my position is that of a trustee for the reclamation fund and for the state in one instance, and a trustee for the Navy for the public lands, upon which there is no private claim within the naval reserve. Holding the view which I did hold as to the Midway Company having some equity, but being desirous of adjudicating the matter, if possible, to the end that the Navy might have no possible objection, I called upon Col. Doheny, head of the Pan-American Company, by telegram, stating the facts to him, and that he was entitled to his lease and would have it executed under one of his bids, but asking if it were possible for him to assist me in an adjustment of the Midway claims, by agreeing to surrender 8 wells out of the 22 which were advertised by the Navy and allotted to him under his bid; he retaining the lease upon the other 14. I thought that I was imposing upon Mr. Doheny, and even at the insistence of the Navy officials was not justified in doing so, except through a personal appeal based upon our long-time acquaintance and my knowledge of the patriotism and sense of justice. I received an immediate and favorable response, and I have had the leases drawn to himself for the 14 wells, and to the Midway Company for 8 wells which he surrenders.'

"I desire the President's file to show my appreciation of your action in this matter, which, however, I had explained to him verbally. I shall not forget your assistance in this case. There will be no possibility of any further conflict with Navy officials and this department, as I have notified Secretary Denby that I should conduct the matter of naval leases under the direction of the President, without calling any of his force in consultation, unless I conferred with himself personally upon a matter of policy. He understands the situation, and that I shall handle matters exactly as I think best, and will not consult with any officials of any bureau in his department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy.

"Very sincerely yours, Albert B. Fall.
"Col. E. L. Doheny,
　"Suite 2805, 120 Broadway,
　　　　　"New York City."

The contention of defendants that the leases in suit were the work of Secretary Denby, and that Secretary Fall acted merely as his agent, is utterly devoid of merit, when considered in the light of his ultimatum in this letter, and his attitude and conduct throughout all of the negotiations that resulted in the making of the contracts and leases in controversy in this case.

[11] The formal lease effecting the compromise concerning the royalties of the July 12 lease is dated December 14, 1921. It was signed by Assistant Secretary Finney, as Secretary Fall was absent from Washington at that time. As I have said, at the time the relief from the July 12 lease was ordered by Secretary Fall, he and Mr. Doheny were and had been in consultation over the exchange of royalty oil from the naval oil reserves for fuel oil and tankage. They had been discussing and negotiating specifically concerning the Pearl Harbor project and the leasing of more lands to Mr. Doheny's companies in the naval oil reserves to pay for the same. They had reached a definite understanding and agreement concerning the making of the contract, which was later formally executed on April 25, 1922, wherein there is contained the valuable preferential right to lease practically the entire naval oil reserve.

The record also clearly established that simultaneously Secretary Fall had told Mr. Doheny of his misfortune and of his desire to secure more land near his ranch in New Mexico, but of his inability to do so on account of financial embarrassment. Mr. Doheny had told Secretary Fall during this time that he would loan him the money to make the desired purchase, and on November 30, 1921, at the very time that the contract of date April 25, 1922, and the granting of further leases in the naval oil reserves was being discussed by Secretary Fall and Mr. Doheny orally and by correspondence, Mr. Doheny advanced and caused to be delivered to Secretary Fall $100,000 pursuant to his promise.

It is claimed that this was a personal transaction between these two old friends, and had no connection with and was entirely independent of the public business dealings that were then in progress by Mr. Doheny, as the principal officer and agent of the Pan-American Petroleum & Transport Company, with Secretary Fall, as the trustee of the naval petroleum reserves and Secretary of the Interior of the United States. It is impossible for the court to so conclude.

It is this powerful, ineffaceable, and unexplained circumstance which impels me to cancel the leases which gave to the companies controlled by Mr. Doheny a property right of immeasurable value. This incident

is the central, insurmountable, and decisive fact in this case. The injury that it has done the nation, as well as the distrust of public officers that it has caused, cannot be overestimated. This colossal infamy, regardless of whether it was a bribe, a gift, or a loan, requires this court in conscience to strike down the deals which are inextricably connected with it, and to restore to the nation its naval oil reserve. Neither of the men who participated in this extraordinary transfer of money have given this court an opportunity to hear his version of this incident from the witness stand, and the record which they have written elsewhere concerning it, and its correlated events, spell conspiracy.

If the incident is to be viewed and judged in the light of human experience and reason, and is to be determined according to the usual, ordinary, and natural probabilities in such situations, it cannot be said with any degree of certainty that the delivery and payment of this large amount of money at such time had nothing to do with Secretary Fall's official action and conduct, whereby he actively participated in awarding to companies controlled by Mr. Doheny rights and leases in the naval oil reserves of great value. The circumstance itself is so indicative of improper influence and official misconduct, and was so conducive to favoritism, as to require a court of equity to conclude that any advantage or benefit obtained from the government by Mr. Doheny's companies through the agency or official act of Secretary Fall was influenced, at least, by the payment. It is possible that it did not affect or influence Secretary Fall in doing what he did relative to these contracts and leases. It is not probable. It has not been satisfactorily or sufficiently explained in this case.

The case, however, does not require the court to predicate its finding on this telling and decisive incident solely upon the time and amount of the money transfer. The manner in which it occurred and the conduct of the two men relative thereto arouse further suspicion, and indicate a consciousness of wrongdoing by them. On November 28, 1921, Mr. Doheny wrote Secretary Fall a letter which, in my opinion, substantiates the charge of the conspiracy alleged in the amended bill, and which undeniably discloses that the two men had been conferring and negotiating regarding the Pearl Harbor contract of April 25, 1922, and that further leasing of the reserves was also then under consideration by them. This letter is as follows:

"Pan-American Petroleum & Transport Co.
"Office of the President.
"New York, November 28, 1921.

"The Honorable the Secretary of the Interior, Washington, D. C.—Dear Mr. Secretary: Along the lines of your suggestion, I have made some inquiries regarding the cost of constructing tanks for the storage of 1,500,000 barrels of fuel oil at Pearl Harbor. I find that the best price obtainable for these tanks, the government to stand the cost of transporting the material from the ship's side to the tank site, and the cost of grading and otherwise preparing the tank site, is $19,960 per tank, or $0.363 per barrel of storage capacity. The present price of crude oil in the field in California is $1.13 per barrel. The present cost of fuel oil delivered at Pearl Harbor is $1.90 per barrel. The cost of 1,485,000 barrels of fuel oil delivered at Pearl Harbor at present rates would be $2,821,500, which, added to the cost of constructing the 27 tanks necessary to store this amount of oil, which is $538,920, makes a total of $3,360,420.

"Therefore, were we to construct the tanks and furnish the oil on the basis of our being paid for both tanks and oil in royalty crude oil produced from lands within the naval reserve and to be leased to us, it would require a return to us in royalty crude valued at $3,360,420, or 2,973,823 barrels, figured at to-day's price. Of course, interest on the money invested should also be figured until final adjustment is made through the payment of royalty oil.

"I suppose you will turn this matter over to First Assistant Secretary Finney, who, with Rear Admiral Robison, may arrange the details of it during your absence, and as I also expect to be absent, I am confidentially furnishing Mr. Cotter with the information, so that he can intelligently discuss the matter with Mr. Finney.

"Cordially yours,     E. L. Doheny."

It is also argued by counsel for defendants that this letter was a mere estimate of the probable cost of tankage at Pearl Harbor. Its language connotes something more; but, if it requires interpretation, it should be considered in its entirety, and construed in the light of known surrounding circumstances. Early in November, 1921, the Pan-American Petroleum & Transport Company by letters and telegrams had requested bids from the Lacy Manufacturing Company of Los Angeles, Cal., for the construction of tanks at Pearl Harbor, Hawaii, and the figures given

in the November 28 letter were those obtained from the Lacy Company.

After Mr. Doheny's letter of November 28, 1921, was received by Secretary Fall, it was delivered to Dr. H. Foster Bain, who at that time was Director of the Bureau of Mines of the Department of the Interior. Some time before Secretary Fall handed this letter to Dr. Bain he had told Bain either that he had asked Mr. Doheny or Mr. Doheny had volunteered to have an estimate made of the cost of putting up storage to the extent of 1,500,-000 barrels of oil. Dr. Bain testified that the first time that he heard of Secretary Fall's plan to use royalty oil from the reserves as a consideration for tankage and fuel oil was at a conference with Secretary Fall when Admiral Robison was present subsequent to October 23, 1921, and no mention whatever was made by Secretary Fall or any person at such conference that it would be necessary, or that it was contemplated, to grant further and additional leases in the naval oil reserves to Mr. Doheny. At such conference, however, Secretary Fall told Dr. Bain that he was expecting a communication from Mr. Doheny on the subject of the construction of the Pearl Harbor project of providing storage for 1,500,000 barrels of fuel oil in consideration of government royalty oil from the reserves, and that he expected Mr. Doheny to bid on the proposition. Although he said nothing to Dr. Bain on the subject of further leases to Mr. Doheny, the letter which he said he was expecting, besides containing the information he told Bain he expected, also contained language indicating that there had been an understanding and agreement to grant further leases.

This letter of November 28 Dr. Bain brought to Assistant Secretary Finney about the middle of December, 1921, and requested that Finney write to Mr. J. J. Cotter, a vice president of the Pan-American Petroleum & Transport Company, and request Mr. Cotter to call upon Dr. Bain relative to Mr. Doheny's letter. Mr. Finney complied with this request and wrote the following letter:

"Department of the Interior.

"Washington, December 16, 1921.

"Mr. J. J. Cotter, Pan-American Petroleum & Transport Company, 120 Broadway, New York, N. Y.—Dear Cotter: Will you be in Washington any time between now and December 27? If so, please call on Director Bain, of the Bureau of Mines, who wishes some information from you with respect to the matter discussed in Mr. Doheny's letter of November 28, 1921. Please let me know when you will be here.

"Sincerely,

"[Signed] E. C. Finney,
"Acting Secretary."

Upon the office copy of said letter in the files of the Interior Department there appears a notation in the handwriting of Dr. Bain, reading:

"I asked Mr. Finney to send this, since Doheny's bid will be considered through the New York office, and I thought we might get it outlined before we go West. Bain."

Here is a definite statement showing that it was understood by Dr. Bain that the November 28 letter was more than a mere estimate. Admiral Robison surely regarded the November 28 letter from Mr. Doheny as a definite proposition, because at a meeting of the General Council of the Navy on November 29, 1921, after he had seen and read the letter, he told the Council that he had with him at that time a definite proposition to supply the 1,500,000 barrels storage at Pearl Harbor and to complete it within the next calendar year. He did not at that time regard the letter as a mere tentative, incomplete, prospective suggestion, for at that time he further said to the Council: "All I have got to do is to say on this letter is we can get the tanks built." The letter of November 28, 1921, was not a mere estimate, as counsel for defendants contend:

The words in the letter, "lands within the naval reserve and to be leased to us," imply nothing if they do not indicate an understanding previously had, and, when read in connection with the final paragraph of the letter, show that it was contemplated and agreed between the two men that a contract would be arranged along the lines of the letter, and that the only matters remaining undetermined were the "details" of the plan. This was unquestionably Mr. Doheny's mind when he wrote the letter, and undoubtedly Secretary Fall's when he received it, because he immediately sent it to Admiral Robison with a covering letter, as follows:

"November 29, 1921.

"My Dear Admiral: Mr. Cotter will wait upon you with data, etc., with relation to oil tanks and royalty oils in connection with Pearl Harbor demands. I have asked him, also, to hand you, for your inspection, the original of a letter from Col. Doheny, addressed to myself, containing a résumé of the data.

"Should you think best to accept this proposition, then of course it would be nec-

essary, in my judgment, to turn over to Col. Doheny, if we can do so, leases upon further wells or area in the naval reserve in which he is now drilling. If this is done, it must be understood that the royalty must be made less than are the present royalties being paid by the Midway and Pan-American.

"The gas pressure is lessened to such a degree that the output of the wells of the two latter companies, as well as of other companies drilling in this neighborhood, is decreasing and is very disappointing. The two companies named are pumping their wells, and of course they are not making any money, but will experience a loss in the payment of the 55 per cent. royalty to the government.

"If you approve the proposition, will you kindly indicate to me such approval by simple indorsement upon Col. Doheny's letter to myself, signed by yourself. Your simple O. K. will be sufficient.

"Very sincerely yours, Albert B. Fall. "Rear Admiral John K. Robison,
"Engineer in Chief, Navy Department."

The matter is not referred to as an estimate, but as a proposition, which needs only the simple O. K. of Admiral Robison and the deal will be carried out. There is no doubt expressed of Secretary Fall's intention to give Mr. Doheny further leases. The doubt Secretary Fall entertained was the legal right to do so, and he never sought legal advice in the matter, but later accepted and acted upon an opinion which Admiral Robison obtained from the Judge Advocate General of the Navy, which held that the right existed. This opinion was requested by Admiral Robison on November 30, 1921, and was given on December 3, 1921.

The messenger who took the above letter from Secretary Fall to Admiral Robison was Mr. J. J. Cotter, vice president of the Pan-American Petroleum & Transport Company. What Mr. Cotter was doing in Secretary Fall's office, and what conversation he had with Secretary Fall on this eventful day, has not been disclosed in this case. Admiral Robison returned the letter of November 28 to Secretary Fall, and Secretary Fall, as before stated, handed it to Dr. Bain, with instructions that Bain work out a contract to carry out the Pearl Harbor project. This letter of November 28 was not placed in the general file of the Interior Department. It was kept in a safe in Dr. Bain's private office, with other documents of a confidential character. There is no evidence that any other individual or concern was asked by Secretary Fall to estimate on this project,

although Admiral Robison testified that Secretary Fall told him that he was going to request estimates from several oil concerns.

Another notable circumstance in connection with the November 28 letter is the fact that at the time of its receipt, which was months before any invitations to bid were sent to others, the Pan-American Petroleum & Transport Company had not only been permitted by Secretary Fall to negotiate with a view of bidding, but it had actually submitted a bid to Secretary Fall on the Pearl Harbor project. This was privilege and discrimination that was unwarranted and improper, and, in view of the personal transactions between Secretary Fall and Mr. Doheny at the time, was significantly suspicious.

On November 29, 1921, whether before or after he received Mr. Doheny's letter we do not know, Secretary Fall, in Washington, D. C., telephoned to Mr. Doheny, in New York, that "he was prepared now to receive that loan—to make the loan," if Mr. Doheny was willing to make it. Mr. Doheny immediately arranged to procure and transmit the money to Secretary Fall. He did so in a peculiar, suspicious, and irregular way. He knew that Secretary Fall wanted the money to make settlement in New Mexico for property in New Mexico. He also knew that Secretary Fall was leaving immediately for New Mexico. He did not send the money to New Mexico, and he did not transmit it by the customary commercial mediums. Although he was a man of great wealth and financial power, instead of drawing the money himself, or from his bank account, he had his son obtain it from a bank with his son's check, and he had him obtain the $100,000 in currency. He then had his son wrap the currency in paper, and place it in a hand satchel, and personally convey it from New York to Washington, and personally deliver it to Secretary Fall in Washington. Fall immediately left Washington, and carried the $100,000 in currency on the train across the continent, and deposited it in different banks in Texas and New Mexico, and later by checks thereon applied it on the purchase price of the lands.

There was no record of any kind made of this transaction in the personal or business books or records of Mr. Doheny, or of any of his companies or enterprises. No one but Secretary Fall, Mr. Doheny, and his son knew of the transaction until long after the contracts and leases in question were made. The utmost secrecy concerning the event prevailed and was maintain-

ed by every one, until it was revealed by Mr. Doheny in January, 1924, in an investigation of leases upon naval oil reserves by the committee on public lands and surveys of the United States Senate.

When the $100,000 was delivered to Secretary Fall on November 30, 1921, he executed, signed, and delivered his promissory note, payable on demand, after date, to Edward L. Doheny, or order, in the sum of $100,000, with interest at no specified rate. He handed this note to E. L. Doheny, Jr., who took it to New York and gave it to his father within a day or two after it was made. No security of any kind was given. No payment of principal or interest has ever been demanded or made. The note as a complete enforceable evidence of indebtedness was never deposited or filed in any receptacle other than the pocketbook carried by Mr. Doheny on his person.

About two weeks after receiving the note, and on the eve of his departure from New York for his home in California, Mr. Doheny mutilated the note by tearing the signature therefrom. He gave the portion containing Fall's signature to his wife, and retained in his personal possession the other part of the note. He told Mrs. Doheny that he had made Mr. Fall this loan of $100,000, and that if, on their journey homeward, anything should happen that he and Mrs. Doheny should be killed in a wreck, and their executors found the note, and would present it, and press Mr. Fall for it, Fall would then be worse off than he was before the money was loaned, and he did not wish Mr. Fall to be pressed for payment of the note.

Before the Senate committee Mr. Doheny similarly explained this peculiar act by saying that, as he was about to entrain for a long journey, he wished to avoid the possibility of the note as an enforceable obligation of Mr. Fall's coming into the hands of others. He said that, if he was killed en route, he did not wish Mr. Fall pressed for payment by his executors; for, if the note in its entirety fell into the hands of his executors, it would be their duty to enforce its payment, and, if both he and his wife were killed in the same accident, part of the evidence of Fall's obligation would be found on his body and part thereof on Mrs. Doheny's body, and no one would know the connection of the two fragments, except his son, who was familiar with the circumstances of the delivery of the money, and who would not press Mr. Fall for payment on account of his financial condition.

6 F.(2d)—5

If this peculiar money transaction was a pure, private, and personal affair, in which these two old friends innocently participated, if it were a pure and unadulterated loan, as defendants contend, it is peculiar and unnatural that it should have been accomplished and attended with so many suspicious circumstances. To sustain the contention of the defendants with respect to this money transaction, the court must lay aside every natural, human, and probable construction, and accept an unusual, extraordinary, and improbable explanation. The contention of the defendants with respect thereto cannot be sustained upon any other hypothesis. This court cannot give its judicial sanction to any such unnatural and unreasonable explanation.

[12] The safest salutary and correct rule concerning the validity of a public contract made by a governmental officer with a private citizen or concern, where simultaneously and concurrently with negotiations for the public contract the officer clandestinely receives and accepts a substantial amount of money from the person or concern with whom he is negotiating, and who later receives the public contract containing valuable rights to him or to his principal, is to abrogate, annul, and set aside the contract as contra bonos mores and against public policy. This rule should be applied in all such cases, regardless of whether the money transaction is a loan, a gift, or a bribe. In such a situation the whole contract and all official conduct relating thereto are tainted, and it is impossible to say to what extent the contract and official acts were influenced by the concurrent clandestine money transaction. See Garman v. United States, 34 Ct. Cl. 237; Crocker v. United States, 240 U. S. 74, 36 S. Ct. 245, 60 L. Ed. 533; Washington Irr. Co. v. Krutz, 119 F. 279, 56 C. C. A. 1

The natural and irresistible inference of fraud in such cases is present, and can be overcome only by clear and convincing proof that it did not exist. No such proof has been offered in this case. Mr. Doheny himself recognized the significance of this money transaction in the dealings with Secretary Fall that eventuated in his companies obtaining leases on the naval oil reserves from which he expected his companies to make a profit of $100,000,000. In his testimony before the Senate committee the following appears:

"Senator Walsh of Montana: I can appreciate that on your side; but, looking

at it from Senator Fall's side, it was quite a loan.

"Mr. Doheny: It was, indeed; there is no question about that, and I am perfectly willing to admit that it probably caused him to have such a feeling that he would have been willing to favor me. He did not carry on these negotiations. That is the point I would like for you to understand; that Senator Fall, in my opinion, was not influenced in any way by this loan, because the negotiations were carried on by men who were not under his control. * * *

"The Chairman: I am not asking you about the question of collusion. I am examining you concerning your own statement that, by reason of your accommodation to Mr. Fall, you think that, had he a discretion to exercise, he might have been more likely to exercise it in your favor.

"Mr. Doheny: Why, I admit that.

"The Chairman: Very well.

"Mr. Doheny: I don't think he is more than human."

Mr. Doheny based his belief that Secretary Fall was not influenced by the money on the ground that Secretary Fall took no part in the making of the contracts and leases; "that the negotiations were carried on by men who were not under his control." Secretary Fall's activity has already been shown, and it appears throughout all of the negotiations, and until the entire naval reserve No. 1, except one small area, was leased to the Pan-American Petroleum & Transport Company and its subsidiary. He was the final and decisive factor in the transactions, and especially in settling the royalties which the defendants would be required to pay, and it is the magnitude of the leases and the amount of the royalties exacted that determines the value of the leases to Mr. Doheny and the defendants.

The plan to exchange royalty oil due to the United States from the naval reserves for fuel oil and storage therefor involved two main ideas—one of special and essentially naval concern, i. e., constructing and equipping reserve fuel oil stations at strategic points; and the other, leasing to private parties valuable oil lands in the naval reserves. This last element, while correlated to the other, was what made the project of commercial interest to oil producers and companies. It was this last element that was secretly arranged between Secretary Fall and Mr. Doheny. It was this element that was sedulously concealed from all other oil companies and prospective bidders.

[13] Admiral Robison, for the Navy Department, was the dominant factor in accomplishing the first idea, while Secretary Fall exercised control of the second. The contracts not only show this to be true, but the evidence proves that it was the case. All the important and decisive questions relative to leases and royalties are reposed by the contracts of April 25 and December 11 in the Secretary of the Interior. The proof in the case demonstrates that Secretary Fall was the person to finally settle the question of what leases should be given and what royalties should be exacted.

Admiral Robison, in trying to strengthen the national defense by utilizing the naval oil reserve, was less vigilant than he intended to be. I feel confident that if, at the time the award of the April 25 contract was made, he had known or appreciated the real value and significance of the preferential right to further oil leases that was vested in the Pan-American Petroleum & Transport Company by the contract of April 25, 1922, and which was later by the contract of December 11, 1922, and the lease of June 5, 1922, and the lease of December 11, 1922, ripened into control of nearly all of naval reserve No. 1, that he never would have consented to that contract being made, and never would have advised Secretary Denby to sign it. This is borne out by his testimony relative to the matter. He was detailing what occurred when the December 11 contracts were finally agreed to, and when he was trying to get higher royalties for the government than Mr. Doheny would agree to pay. He testified:

"Q. You knew, though, that before you threw it open to public bidding you had to submit it to Mr. Doheny's concern? A. Yes.

"Q. And you also knew that he was to have equal rights with any bidder, if it was thrown open? A. Yes.

"Q. You therefore knew, in effect, that you would destroy competition, did you not? A. I did not know it then.

"Q. But do you do now? A. The preferential right had a great deal more value than I suspected at the time. * * *

"Q. Admiral, you were very anxious to get better royalties there, weren't you? A. Why, yes.

"Q. Did you discuss with Secretary Fall

the question that you could say to Mr. Doheny that you would lay down to him certain royalties under his preferential right, and if he refused then you could turn around and advertise? A. No, I did not.

"Q. Why? A. Because that is the time when that preferential right got its value to the Pan-American Company. I didn't realize that it would be possible to do other than—we could break off negotiations with these people and then advertise; but I didn't believe it would be possible to obtain from any other concern royalties that would compare with those that we could get from the concern that already was in the area. * * *

"Q. And it was determined that advertising should not be done? A. Yes, as I say, that is where the value came to the Pan-American Company in bid 'B.' I think at that time I made a mistake in the value to them of that preferential right. It was of real value to them, though, then."

There is another reason, in my opinion, why the contracts and leases should be voided because of personal and private transactions and relations between Secretary Fall and Mr. Doheny during the course of the negotiations for such contracts and leases. It appears that there was an understanding that Secretary Fall would later enter the employ of Mr. Doheny or of his companies, and that he might repay and liquidate his indebtedness on account of the $100,000 transaction out of the salary which he would then receive for such anticipated and future services. That such an understanding was contemplated and existed is shown by Mr. Doheny's testimony before the Senate investigating committee, in part as follows:

"Mr. Doheny: Well, I will tell you frankly now—I don't know whether this has any connection whatever with the investigation—but I expected that if the Senator did not sell or turn over that land that later on I might employ him in connection with our affairs in Mexico, with which he is very conversant, and I would pay him a salary large enough, of which he could pay about one-half to apply on the note, and pay it off in five or six years. And that was my expectation.

"The Chairman: You had that in mind at that time?

"Mr. Doheny: Yes, sir.

"The Chairman: If Mr. Fall does not enter your employ, do you ever expect to press him for payment of the note?

"Mr. Doheny: Well, I don't know. If Mr. Fall is well enough, and in good health, I expect he will enter my employ.

"The Chairman: You do expect that?

"Mr. Doheny: Yes, sir. * * *

"Senator Pittman: You did not expect him to go into your employ while he was Secretary of the Interior, did you?

"Mr. Doheny: No, sir.

"Senator Pittman: You were to employ him after he ceased to be Secretary?

"Mr. Doheny: After he ceased to be Secretary of the Interior.

"Senator Pittman: Was there anything said with regard to him resigning as Secretary of the Interior before his term was up?

"Mr. Doheny: Yes, sir; he often spoke of that. He often said he was not going to remain very long. * * *

"Senator Pittman: Well, you had in mind employing him and his repaying this note out of his employment?

"Mr. Doheny: Yes, sir.

"Senator Pittman: And he had talked to you about resigning from the job of Secretary of the Interior?

"Mr. Doheny: Yes, sir; but I did not know how soon he would retire, whether he would stay his term out or not. We never discussed the length of time that he would remain in the Interior Department."

This is another incident so indicative of improper influence as to characterize the public contracts in controversy as tainted with fraud, regardless of the intentions of Fall and Doheny with respect to this anticipated and contemplated future employment. The fact that it occurred during the negotiations of the contracts involved in this suit, when considered in connection with the other facts and circumstances in proof, and particularly the $100,000 transaction, so taints and contaminates such contracts as to require a court of equity to set them aside.

The actual effect of the contract of April 25 and the valuable preferential right which it conferred upon the Pan-American Petroleum & Transport Company was to utterly destroy competition for any oil leases in naval reserve No. 1. It is true that for this concession to the Pan-American Petroleum & Transport Company the government saved approximately $500,000 in the Pearl Harbor project. But the destruction and prevention of competition in a public matter of such gigantic proportions as leases to more than 30,000 acres of proven oil-bearing land, which represent a potential profit to a lessee of $100,000,000,

cannot be justified under the facts and circumstances shown by the evidence in this case.

[14] It is contended by defendants that the contracts and leases in controversy were fairly obtained by competitive bidding. The evidence does not sustain this claim. Aside and apart from the question as to whether the contracts and leases in question could be lawfully made without competitive bidding, the manner in which the bidding upon the April 25 contract was conducted, as well as the way in which the agreements were negotiated and executed, manifests in my opinion a determined purpose on the part of Secretary Fall to favor the companies controlled by Mr. Doheny to the prejudice of other prospective, available, and actual bidders. There is official conduct and correspondence of Secretary Fall which indicates that in making the contracts for the construction of the Pearl Harbor project, and in leasing the naval oil reserves to the defendants, he never intended that these matters should be effected by genuine competition. It is neither improbable nor unreasonable to infer that Secretary Fall, when the letter of November 28, 1921, was received, had concluded to lease the entire unleased areas in reserve No. 1 to Mr. Doheny's enterprises.

After Secretary Fall and Mr. Doheny had tacitly agreed upon the Pearl Harbor contract, as shown by the November 28, 1921, letter, a form of competitive bidding was inaugurated and pursued by the Interior Department relative to said contract. But it had no substance. It was feigned and illusory. It was discriminatory, deceptive, and unequal. Responsible concerns that desired to bid were without good reason not permitted to do so. Public officers and citizens, who sought information relative to matters in contemplation by the Interior Department, were designedly misinformed. Secrecy was observed and maintained throughout the negotiations, under a pretense of emergency war plans. Information, opportunities, and advantages were given to officers of the Pan-American Petroleum & Transport Company that were not accorded to any other bidder.

[15, 16] The Interior and Navy Departments considered competitive bidding to be necessary in order to make the contract of April 25, and having so concluded they were required to invite real competition. It should have been invited upon common ground. There is no competition, unless the bidding is done upon the same basis. The bidders must each and all be given the same information. There must be no discrimination or partiality, and wherever, in invitations to bidders, it is stated that the bidders may propose alternative bids, the alternatives that will be considered should be defined, so that the bidders may understand them, and so that, upon the submission of several alternative bids by different bidders, a comparison of their relative merits and values can be made. If the form of the alternatives suggested to the bidders is such that alternative bids submitted under the invitation are incapable of a fair comparison the bidding is noncompetitive. United States v. Ellicott, 223 U. S. 524, 32 S. Ct. 334, 56 L. Ed. 535; Inge v. Mobile, 135 Ala. 187, 33 So. 678, 93 Am. St. Rep. 20; Shaw v. Trenton, 49 N. J. Law, 339, 12 A. 902; Tice v. Long Branch, 98 N. J. Law, 214, 119 A. 25.

Invitations to bid on the original Pearl Harbor project were sent out by the Interior Department in February, 1922, to five principal oil companies operating on the Pacific Coast. After they were sent out, certain high naval officers objected to them, on the ground that they called for the doing of the work at Pearl Harbor by the contractor on a cost plus percentage or fixed fee basis. The Interior Department recognized the force of their objection and modified the invitations, so as to call for bids wherein the contractor agreed to do the work on a lump sum basis and the first invitations were recalled. On March 7, 1922, second invitations were sent to the same five companies inviting alternative bids on two propositions. The bidders were invited to submit on the construction feature of the proposed contract either a lump sum bid for the whole, or a bid based on firm lump sum subcontracts for at least two-thirds of the work and some other supplementary bid for the remainder. These invitations permitted the bidder to submit on the fuel oil feature of the proposed contract either a bid stated in a ratio of barrels of fuel oil for barrels of royalty crude oil, or to state the relation in other terms. These permitted alternatives implied nothing concerning proposed leases or preferential rights to lease. They concerned only construction features or exchange of oil relative thereto. There was no suggestion, intimation, or inference deducible from the invitations to bid that the government would consider or intended to grant additional oil leases in the naval reserves, or a preferential right to any additional oil

leases therein which the government might thereafter determine to grant.

Before any of the invitations to bid were sent out and in January, 1922, Dr. Bain made a tour of California to consult and confer with officials of the oil companies that were to be invited to bid on the proposed contract for the Pearl Harbor project. Before he left Washington he knew that the Pan-American Petroleum & Transport Company would bid on the project, and there is strong reason to infer from the evidence that before reaching California he knew what its bid would be. It is certain that at such time he had been apprised of Mr. Doheny's early promise to bid on the construction without profit to his company.

On the train across the continent, Dr. Bain was accompanied by Mr. Cotter, whom the evidence in this case shows was an attorney at law and the officer of the Pan-American Petroleum & Transport Company, who had more to do with the negotiations and making of the contracts in question than any other agent of the defendants with the exception of Mr. Doheny. Mr. Cotter had been employed in the Department of the Interior prior to his association with the defendant companies. He and Dr. Bain were friends and had been former associates in the Interior Department. Mr. Cotter was private secretary to Secretary of the Interior Lane and Dr. Bain, during Secretary Lane's administration, was Assistant Director of the Bureau of Mines in the Interior Department. Dr. Bain and Mr. Cotter were both westward bound on the same train and concerning the same enterprise. En route Dr. Bain stopped off at Three Rivers, N. M. He was met at the depot by Secretary Fall. Mr. Cotter merely stepped off the train to greet Secretary Fall at the station, and continued on to Los Angeles by the same train. Dr. Bain stayed overnight at Secretary Fall's ranch, and went over the entire Pearl Harbor project with Secretary Fall, informing him of the status and developments relative thereto since Secretary Fall left Washington about December 1, 1921, and of his (Dr. Bain's) mission to the Pacific Coast. He secured Secretary Fall's approval to all that had been done up to that time, and Secretary Fall authorized him to continue with the negotiations, "subject to the working out of a contract." Secretary Fall was careful throughout to restrict the authority of his subordinates, so that they could not finally conclude a contract without his personal approval.

Dr. Bain resumed his westward journey the day after his conference with Secretary Fall, and reached Los Angeles January 2, 1922. Upon arrival he was met at the depot by Mr. Cotter, and the two men were later joined by Mr. J. Crampton Anderson, another vice president of the Pan-American Petroleum & Transport Company. The three men spent the day together. On the following morning Dr. Bain met Mr. Doheny, Mr. Cotter, Mr. Anderson, and other officers of the defendants in the offices of the company at Los Angeles. At this meeting Mr. Doheny repeated a statement he had previously made that his company would submit a bid in the matter of the Pearl Harbor project.

Before Dr. Bain left Washington, and of his own volition, he had requested Mr. Gano Dunn, of the J. G. White Engineering Company, of New York, to make an offer to do the construction work of the Pearl Harbor project; and in a letter written by Mr. Dunn to the Bureau of Mines of the Interior Department on December 29, 1921, reference is not only made to the proposal of the White Company to do the work, but it is further stated that the White Company hope to amplify their proposal to suit any new condition which might be imposed as a result of Dr. Bain's visit to the Pacific Coast.

The proposed Pearl Harbor project was foreign to the ordinary and normal activities of a producing oil company. While the plan was to secure the construction of the Pearl Harbor project by the use of royalty oils coming to the government from the naval oil reserves it also involved services that were essentially of an engineering nature; and neither the Pan-American Petroleum & Transport Company, nor any other commercial oil-producing company, was equipped and prepared to carry out the proposed contract in its entirety. The difficulties of this situation were met by teaming up the J. G. White Engineering Company with the Pan-American Petroleum & Transport Company. This was accomplished through the agency of Dr. Bain, who upon his return to the East arranged a meeting between Mr. Dunn and other officers of the White Company with Mr. Doheny and other officers of the Pan-American Petroleum & Transport Company, with the result that a coalition was formed which made it possible and practicable for the Pan-American Petroleum & Transport Company to obtain the contract of April 25, 1922, and the leases of the naval oil lands, which were granted by the Interior Department in order to effectuate said contract and the later one of December 11, 1922.

Here was a situation which in and of itself gave to the Pan-American Petroleum & Transport Company a distinct advantage over any other oil company or concern that might be interested in bidding on the Pearl Harbor project. The company controlled by Mr. Doheny was not only privileged in having the friendship and confidence of the Interior Department, but it was favored to the extent of constant and intimate conferences with the officers of the Interior and Navy Departments, which according to the evidence was not extended to the same degree to any other bidders.

The activities of Dr. Bain in California are illuminating in this case. He came apparently to submit the entire project to the principal oil companies operating in California oil fields in the vicinity of the naval petroleum reserves and to invite them to bid on equal terms on the Pearl Harbor project. After the conference with the officers of the Pan-American Petroleum & Transport Company at Los Angeles, he went to San Francisco, where he interviewed officials of the following companies in the order named: The Standard Oil Company; Ford, Bacon & Davis, an engineering firm that had much business in connection with the Standard Oil Company; the General Petroleum Company; the Associated Oil Company; and the Pacific Oil Company. The result of such conferences may be summarized as follows:

The Standard Oil Company stated that they would not be interested in the construction part of the contract, as their attorney had advised them that there was no legal power under the Act of June 4, 1920, for the government to make the contract in the manner proposed.

The General Petroleum Company went even further, and stated that they would not submit any bid in the matter, as their attorney had advised against the legality of the proposed contract. They suggested, however, that an opinion on the legality of the contract be obtained from the Attorney General, and, if he held that the Secretary of the Interior could legally enter into the arrangement, the company would then consider it.

The Associated and the Pacific Oil Companies, which are affiliated companies, also came to the conclusion that the proposed contract was unauthorized by the Act of June 4, 1920, and stated they would bid only upon condition that Congress approved the proposed contract.

The engineering firm referred to only expected to work conjointly with the Standard Oil Company, and they made no statement that they would bid independently, and, as will appear later, this firm submitted no bid.

With this information, Dr. Bain returned to Los Angeles, where he first interviewed officials of the Union Oil Company of California. The true situation respecting this company is uncertain on account of an irreconcilable conflict in the testimony of Dr. Bain and Admiral Robison relative thereto. Dr. Bain testified that he got the impression from the officers of the company with whom he conferred that they were not interested in the proposed contract, and he therefore did not leave plans of the project with them, and did not send to that company a written invitation to bid, as he did to each of the other companies interviewed. Admiral Robison testified that Dr. Bain reported to him that the Union Oil Company was anxious to bid, and that the government undoubtedly could get a bid from it, if one was wanted, but that he (Dr. Bain) advised against it on account of the company being foreign owned. This company, however, did not bid, but, when it learned that the contract of April 25 had been made, it protested that it had not been given an opportunity to bid on the same.

The final interview that Dr. Bain had with any oil company on the Pacific Coast was a second conference with the officers of the Pan-American Petroleum & Transport Company at Los Angeles, when Mr. Doheny reiterated his promise and intention to make a bid on the contract. It thus appears that the first as well as the last company to be interviewed and consulted by Dr. Bain on his Western trip was the Pan-American Petroleum & Transport Company.

Upon Dr. Bain's return to Washington, he reported the result of his trip to Secretary Fall, and it must have been expected by Secretary Fall that there would be no real competition—indeed, it must have been known to him that there would be only one bidder who would unconditionally offer to do the work of the Pearl Harbor project in consideration of the royalty oil from the naval petroleum reserves, and that it was the company owned in large part and controlled by his friend and benefactor, Mr. Doheny. The only other concerns that were given plans of the Pearl Harbor project and asked to bid thereon were the Pittsburg-Des Moines Company and the Foundation Company of New York. Being unable to make any satisfactory arrangements to dispose of the royalty oil which was to be the consideration for the

Pearl Harbor construction under the plan, these companies were never heard from in the matter.

I am strongly persuaded by the evidence in this case to believe that Secretary Fall never really intended that there should be competition in the plan that he had devised for leasing all of the naval oil reserves. In my opinion it was fear of opposition from naval officers, and because Assistant Secretary Finney, early in the negotiations of the April 25 contract insisted upon competitive bidding, that Secretary Fall consented to even the semblance of competition which the record in this case shows. As early as October 25, 1921, Secretary Fall manifested opposition to public competition in the matter of the leases and contracts in suit; for, when the draft of a letter of that date, which has already been mentioned, was prepared by Admiral Robison in the Navy Department it contained a mandatory provision that the contracts and leases of the naval oil reserves should be let by competitive bidding. When this draft was discussed with him for his approval, Secretary Fall suggested that the words "or otherwise" should be added to a certain phrase in the draft which read as follows: "That the Interior Department will exercise its best efforts to obtain for the Navy as large royalties and as favorable terms as practicable by public competition." The suggestion was adopted by Secretary Denby on recommendation of Admiral Robison. It reveals the mind of Secretary Fall in the premises.

If there had been a sincere and real attempt to interest the leading commercial oil companies in the project, to the end that they would on common ground compete with one another in bidding on the contract, so that the government would obtain the most advantageous and best bid, there would have been a desire and an eagerness to obtain an opinion from the Attorney General as to the legal right of the government to make the contracts. Dr. Bain testified that he informed all of the companies interviewed by him that an opinion had been obtained from the Judge Advocate General of the Navy, and it is reasonable to infer that in his conference with Secretary Fall on the way West he had told Secretary Fall of this opinion. Neither Secretary Fall nor any other officer of the Interior Department or Navy Department ever sought or obtained any opinion from the Attorney General, or any other disinterested legal adviser of the government, as to whether the contract could be legally made, but instead Secretary Fall resorted to secrecy, misrepresentation, and deception.

When Dr. Bain returned to Washington in January, 1922, he recognized the propriety and desirability of obtaining an opinion from the Solicitor of the Interior Department on the legality of the proposed Pearl Harbor contract, and he suggested by letter of January 25, 1922, to Acting Secretary Finney that such an opinion be obtained. Apparently Dr. Bain not only did not feel justified in proceeding with the negotiations for the contract on the strength of the opinion of the Judge Advocate General of the Navy, but the position taken by the oil companies in California evidently persuaded him to request additional legal advice. By this suggestion Dr. Bain appeared to be desirous of securing real competition, to the end that the government would get the best results obtainable. However, no further legal opinion was ever obtained.

Why Dr. Bain did not seek or suggest the Attorney General's opinion is difficult to understand, and his testimony on this point does not clarify the matter. He was asked why, in view of the suggestions of the oil companies, he did not request the Attorney General's opinion; and he answered that he felt that, if he asked for an opinion from the Attorney General's office, he would not know what kind of a lawyer was going to pass on it, and, "while they have some very excellent lawyers in the Department of Justice, that when you ask for an opinion over there you don't know whether it will get to one of them, or somebody who is thinking only of strictly technical legal matters, and who gives you a highly technical legal opinion, and who has no responsibility whatever for carrying out a thing or getting anything done, or somebody who is merely interested in building up a good record for himself, and never letting anything be done which might come back on him."

So it appears that, notwithstanding Secretary Fall was told by Dr. Bain upon his return from the West of the objections of the oil companies to the making of a contract, that one of the attorneys for one of the oil companies had submitted a written opinion opposing the legal right of the government to make the contracts, and notwithstanding another counsel for another of the oil companies came to Washington and told Fall that he believed the contracts were unauthorized by law, in the face of all these circumstances and events, Secretary Fall remained adamant. This was a peculiar posi-

tion for him to take, if he was not trying to thwart competition and to favor his friend and benefactor Mr. Doheny. If the real purpose of Secretary Fall had been to obtain for the Navy as large royalties and as favorable terms as possible, it would have contributed greatly to the accomplishment of such purpose to have stimulated interest and competition among the various oil companies, by assuring them by a legal opinion from the legal department of the government, which was in no way connected with or directly interested in the success or failure of the Pearl Harbor project, that the contemplated contract could be lawfully made. The failure to adopt such a course is another badge of fraud, and another of the many suspicious circumstances concerning Secretary Fall's activities in the matter of the making of the contracts in controversy in this case.

An incident which illustrates Secretary Fall's eagerness to close the Pearl Harbor project contract, and another agreement by which he leased naval petroleum reserve No. 3, in Wyoming, at the same time, occurred a few days days before April 15, 1922, the day upon which the bids on the Pearl Harbor contract were to be opened. Secretary Fall was preparing to leave for a visit to his ranch in New Mexico, and he asked Dr. Bain and Assistant Secretary Finney how the Pearl Harbor contract was getting along, and when they told him that it was not possible to open the bids until April 15 he was disappointed, and became impatient at the delay in the Pearl Harbor matter, saying that he wished to close both matters together. At the same time he wrote a letter to Secretary Denby, in which he stated that he was delaying the Pearl Harbor matter purposely, in order that application might be made to have Congress pass some measure that would expressly authorize the exchange of royalty oil for storage and fuel oil.

There are many other circumstances and details connected with the so-called competitive bidding leading up to the contract of April 25 that are curious and suspicious. But this opinion would be too voluminous to mention them all. Suffice it to say that from all of the evidence relative thereto I am satisfied that there was no real competition between the bidders, but that the competition was a sham and a pretense.

The revelations at the opening of the bids in the Interior Department on April 15, 1922, substantiate the opinion that there had been no real competition, and that pre-

cisely what must have been anticipated by Secretary Fall actually happened when the bids were opened. There were three bids submitted. The Standard Oil Company submitted a bid on the Pearl Harbor project which excluded the construction work. The Associated Oil Company bid conditionally on the approval of the contract by the Congress; and the only other company to bid was the Pan-American Petroleum & Transport Company, which submitted two bids, denominated "Proposal A" and "Proposal B," respectively. The former was in exact conformity to the invitation, and involved a profit to the Pan-American Company. The latter was for about $235,000 less, and contained a proffer to further credit the government against the proposal sum for all savings which might be accomplished in the actual construction of the Pearl Harbor project. It was a bid to do the work at cost. In this respect it carried out the promise made by Mr. Doheny to Admiral Robison. It was conditioned, however, on the grant of a preferential right to all oil leases which might be thereafter made by the government in naval petroleum reserve No. 1. In this respect it was in line with the understanding between Secretary Fall and Mr. Doheny in November, 1921, as to granting further leases to Mr. Doheny or to his companies in the reserves.

As previously stated herein, there was nothing in the written invitations that were sent out to the various oil companies and others who were asked to bid to indicate that the Interior Department intended to or would consider a proposition of a preferential right to lease the naval oil reserves; and no company other than the Pan-American Petroleum & Transport Company apparently considered that a proposal embodying such preferential right would be entertained by the Interior Department, or that such a proposition would be in accordance with the invitation to bid. No other company than the Pan-American Petroleum & Transport Company had information such as was referred to in the letter of November 28, 1921. Secretary Fall had never told any other officer of any other oil company that he would or expected to grant further leases to oil lands in connection with the Pearl Harbor construction.

It is suggested that "Proposal B" was conceived by Mr. Cotter. But Mr. Cotter was not called as a witness. It may have been that Mr. Cotter actually phrased "Proposal B," but it is also quite probable that he did so from information that he received

from other officials of the Pan-American Petroleum & Transport Company and from the letter of November 28, 1921, for Mr. Cotter was in the office of Secretary Fall on the day that Secretary Fall received the letter from Mr. Doheny, and it is a fair inference that Mr. Cotter had discussed with both men the matters that had occurred between Secretary Fall and Mr. Doheny relative to the Pearl Harbor construction work and the granting of further leases in the naval reserves to pay for same.

None of the other companies, except possibly the White Engineering Company, that was collaborating with the Pan-American Petroleum & Transport Company, had been told of the understanding that Mr. Doheny and Secretary Fall had in October, 1921, that the Pan-American Petroleum & Transport Company would bid on the Pearl Harbor construction at cost and without profit; and why competition was invited on a construction project that one prospective bidder had stated it would build at cost is difficult to understand.

The only contract in suit as to which there was any kind of competitive bidding was the Pearl Harbor construction contract of April 25, 1922. There was no bidding of any kind for either of the leases by which the Pan-American Petroleum & Transport Company obtained dominion and control of about 32,000 acres of the richest oil lands of the naval reserves of the nation; and there was no bidding, competitive or otherwise, for the contract of December 11, 1922.

[17] As previously mentioned, one of the contentions of the defendants in this case is that, even assuming that fraud and conspiracy have been proven, the contracts cannot be annulled and canceled because no pecuniary damage has been shown. While, as I have said, I do not agree with this contention, the way in which the so-called competitive bidding was carried on, and the partiality that was exhibited in awarding the contracts, furnish an answer to this contention; for, if all of the persons invited to bid had been told that one of the bidders had already agreed to do the construction work at Pearl Harbor at cost and without profit, such information would probably have suggested to the bidders that under the privilege of submitting alternative bids some matter concerning the leasing of lands in the reserves was contemplated by the government and might be considered, and in such event all bidders would probably have submitted more attractive bids for the contract.

It cannot be said, therefore, that if the bidding had been upon common grounds, and had been really competitive, the government would not have received greater value for its oil and oil leases than it has under the contracts and leases in suit. Moreover, according to Mr. Doheny's testimony before the Senate committee, his companies expected to make a profit of $100,-000,000 from the contracts and leases in suit. If the various oil companies had known or realized what Mr. Doheny had been told by Secretary Fall, it is more than probable that less profit would have satisfied them, which would, of course, have correspondingly increased the value that the government would receive on account of the leases and contracts in question.

After the bids were opened on Saturday, April 15, 1922, at 12 o'clock noon, in the office of Assistant Secretary Finney of the Interior Department, they were turned over to Dr. Bain and Mr. A. W. Ambrose, Chief Technologist for the Bureau of Mines of the Interior Department; and on Monday, April 17, 1922, Mr. Ambrose filed a report and comparison of the bids with Acting Secretary Finney, and recommended that the bid of the Pan-American Petroleum & Transport Company, under "Proposal B," be accepted, for the reason that it was the lowest bid submitted, and that the Pan-American Petroleum & Transport Company had drilled other leases in naval reserve No. 1 satisfactorily to the Department of the Interior, and that by granting the preferential right, as suggested in "Proposal B," the department was certain of a direct saving of over $235,000 and the possibility of further saving.

After the report was received, Assistant Secretary Finney conferred with Admiral Robison, and as a result wired to Secretary Fall, who was then at his ranch in New Mexico, recommending, on behalf of himself, Mr. Ambrose, and Admiral Robison, acceptance of the Pan-American Petroleum & Transport Company alternative bid under "Proposal B." Secretary Fall answered by stating, if Admiral Robison and the Secretary of the Navy concurred and authorized it, to immediately award and close the contract with the Pan-American Petroleum & Transport Company, and to make public entire policy in fullest and completest manner. Thereupon Assistant Secretary Finney advised the Pan-American Petroleum & Transport Company by letter of the acceptance of their "Proposal B" and awarded the contract to them thereon.

Prior to April 15, when the bids were opened, Assistant Secretary Finney had never discussed with Secretary Fall or any other person the idea of granting a preferential right to further leases in the proposed Pearl Harbor contract. He knew nothing about the intention to grant such right. Neither did Admiral Robison. Immediately after the letter of award was sent, the Bureau of Mines in conjunction with the Navy Department began the preparation of a contract pursuant to the award; and during the conferences relative thereto between Assistant Secretary Finney, Mr. Ambrose, Admiral Robison, and Mr. Cotter, Mr. Cotter brought up the question of the preferential right, which was the condition of the bid of the Pan-American Petroleum & Transport Company under "Proposal B." He wanted some definite assurance in writing that his company would receive an additional lease within one year to about 160 acres in one portion of reserve No. 1 and a strip of about 140 acres in another portion of the same reserve, at royalties of from 12½ per cent. to 45 per cent.

Assistant Secretary Finney, Mr. Ambrose, and Admiral Robison had agreed to give such leases if Secretary Fall approved thereof. There was no specific mention of this lease in the Pearl Harbor contract of April 25, but on April 17 a letter was prepared by Assistant Secretary Finney, bearing date April 25, 1922, which was signed by Assistant Secretary Finney and Secretary of the Navy Denby, in which it was stated that the Department of the Interior agreed to grant to the Pan-American Petroleum & Transport Company within one year from the date of the delivery of the Pearl Harbor project contract the two leases requested by Mr. Cotter.

When this letter and the contract were drafted, and on April 20, 1922, Assistant Secretary Finney sent Mr. Ambrose to New, Mexico with all of the papers relative to the award and contract, and instructed Ambrose to acquaint Secretary Fall with all the details in the matter, and to submit the same to Secretary Fall for his approval. Mr. Ambrose arrived at Three Rivers, N. M., on April 23, and, after submitting the entire matter to Secretary Fall, Secretary Fall sent a telegram to Assistant Secretary Finney, authorizing the execution of both contracts; that is, the Pearl Harbor project contract, and the letter of agreement for further leases under the preferential right of the April 25 contract. On April 25, 1922, Assistant Secretary Finney executed and signed the contract and delivered the letter agreeing to give the leases. Immediately thereafter the two documents were sent over to Secretary Denby and he signed the same.

Concerning the making of Secretary of the Navy Denby a party to this contract there is another significant circumstance. It was not the intention to have Secretary Denby sign the contract. Mr. Cotter, however, demanded that Secretary Denby be made a party to the contract, and stated that it would not be acceptable to him unless Secretary Denby signed the contract. Assistant Secretary Finney and Dr. Bain would not assume authority to name Secretary Denby as one of the contracting parties, but wired Secretary Fall of Mr. Cotter's demand, and Secretary Fall authorized Secretary Denby's name to be inserted in the contract. It is apparent that Secretary Fall was the dominant and deciding agency in the making of these contracts by the government. He did not personally participate in all of the negotiations, but he did retain the ultimate power that brought the contract and lease into being. He was the deciding official in making all of the contracts and leases. He and his department always fixed and determined the royalties in the leases.

The scope of the power asserted by the Secretary of the Interior and reposed in him by this contract of April 25, 1922, is forcefully shown by a letter written by Assistant Secretary Finney to Secretary Denby on May 5, 1922. After the contract was executed, there was a discussion between Mr. Cotter, Admiral Robison, Assistant Secretary Finney, Mr. Dunn, and others as to how the construction and other matters covered by the contract would be handled, especially in the event of a dispute or disagreement between the contractors and the Navy or others. Mr. Dunn, who was to do the construction work at Pearl Harbor under subcontracts with the Pan-American Petroleum & Transport Company, insisted that the final arbiter should be the Secretary of the Interior. It was so decided. Admiral Robison consented to such decision, and thereupon the following letter was prepared and transmitted. It was received by Secretary Denby and approved by him, as will appear by his indorsement. The letter reads:

"Department of the Interior.

"Washington, May 5, 1922.

"The Secretary of the Navy—Dear Mr. Secretary: April 25, 1922, the Navy and Interior Departments entered into a con-

tract with the Pan-American Petroleum & Transport Company for the exchange of crude oil for fuel oil in storage at Pearl Harbor. It is important that work under this contract begin at the earliest possible moment, and that the method of procedure and supervision be agreed upon between the two departments. In that connection I submit for your consideration and approval, if you agree, the following:

"Contract consists of two principal parts. The first is the exchange of crude oil for fuel oil, to be delivered in tankers at Pearl Harbor. The second part is the construction of oil storage and the receiving of oil in the tanks at Pearl Harbor.

"The Department of the Interior shall retain direct control of the oil business involved in this contract; in other words, of the first part of the contract mentioned above.

"The Chief of the Bureau of Yards and Docks, Navy Department, Admiral L. E. Gregory, is designated as the representative of the Secretary of the Interior in handling the second part of the contract as noted above. This involves, first, all technical matters in connection with the plans and specifications for storage, and which in its general phases can be most expeditiously handled in Washington; second, the supervision of construction work in the field at Pearl Harbor; and, third, the receiving of the oil at Pearl Harbor from the tankers and placing same in tank storage as it becomes available under this contract until such time as the completed plant shall be turned over to the government.

"The Secretary of the Interior expressly reserves at all times the right to recall the foregoing representation and to designate a successor from the Navy Department as his representative. The right of the contractor to appeal to the Secretary of the Interior, as provided in the contract, is not affected hereby. Notice of any appeal by the contractor from the decision of the officer in charge of the work and the reasons therefor shall be forwarded promptly, being routed through the commandant and the Chief of the Bureau of Yards and Docks on their way to the Secretary of the Interior. This will in no way involve the functions at present exercised by the Chief of the Bureau of Engineering in dealing with the Secretary of the Interior in regard to oil matters in general, since the only function of the representative of the Secretary of the Interior would be the technical work of constructing the tanks,

the receiving and storing of the oil during construction, and reporting to the Secretary of the Interior the amounts received.

"Respectfully,

"Edward C. Finney, Acting Secretary.

"Approved: Edwin Denby, Secretary of the Navy."

It is very doubtful whether Secretary Denby was cognizant of the terms of the contracts. It is certain that he was induced to sign them under misapprehension. He relied entirely upon Admiral Robison for information concerning the contracts and leases, and it is shown that he signed them under the belief that they were necessary as protective measures against drainage on the reserves. Secretary Denby had always taken the position that as much of the oil as possible should be kept in the ground. The contracts and leases in suit were not necessary as drainage protections, and were not so intended by either Admiral Robison or Secretary Fall. The contract of April 25 was simply a contract for the use of royalty oil in payment for a large construction job at Pearl Harbor and the filling of tanks therein with fuel oil.

At the time it was in contemplation the government was receiving royalty oil from certain leases in the reserves, and the Navy desired to use such royalty oil for the construction, instead of selling the oil and paying the proceeds into the treasury, as required by previously existing law. There was no thought at the time of making further leases on the reserves, except for the one purpose of providing additional royalty oils with which to pay for the construction at Pearl Harbor. However, whatever protection to the reserves was deemed necessary had been carried out by the strip leases that were made before the contract of April 25 had been executed; and a further protection to the reserves against drainage was established by the temporary reserve agreement with the Pacific Oil Company, which was made in February, 1922, by which that company, which owned oil lands adjacent to the reserves, agreed with the government to forego further drilling, except on six months' notice. So that neither the Navy officer in charge nor the Interior Department had any thought that the Pearl Harbor project, or the granting of additional leases in connection therewith, had anything to do with the drainage question on the naval reserves.

The Pan-American Petroleum & Transport Company was not required to wait

long for an additional lease under their preferential right and under their letter of April 25, 1922. On May 19, 1922, by Mr. Cotter, the company applied for a lease, and it was granted the lease of June 5, 1922. No other person, firm, or corporation was advised of the government's intention to make this lease. It was made secretly and without competitive bidding of any kind.

[18] There is a circumstance in connection with the letter of April 25, 1922, which granted the lease of date June 5, 1922, to the Pan-American Petroleum & Transport Company, that shows the tendency to favor the company controlled by Mr. Doheny whenever an opportunity came. This letter bears date after the award of the contract of April 25 had been made to the Pan-American Petroleum & Transport Company under their "Proposal B" bid. The award of the contract was made April 18, 1922. As far as an enforceable contract to do the Pearl Harbor work is concerned, one had therefore been accomplished on April 18 by the United States with the Pan-American Petroleum & Transport Company. The consideration had been stated and agreed to. It was unnecessary to give any specific leases to oil lands in the reserves. Mr. Cotter, however, speaking for his company, insisted that the preferential right which was given by the April 25 contract should be immediately transformed from a contingent and inchoate right into a vested one, and his request was acceded to without delay by Secretary Fall.

This was another positive and unmistakable manifestation that the Pan-American Petroleum & Transport Company was less interested in the Pearl Harbor contract and the existing royalty oil from the reserves than with the immediate grant of further valuable leases in the reserves to themselves without competition and through favoritism and discrimination. The Pearl Harbor contract was of no value and of little interest to the Pan-American Petroleum & Transport Company without the preferential right. It was the preferential right that had real commercial value. It cannot be said with any degree of reasonable probability that Secretary Fall's approval of this grant of the June 5 lease and of the later lease of December 11, 1922, were not to some extent influenced by Mr. Doheny's personal benefactions to him. Favoritism, partiality, and discrimination in administering public duties and in reposing valuable public rights in private

concerns are often as destructive to governmental integrity and national welfare as bribery. Public office is yet a public trust, wherein all the people are the beneficiaries.

After the contract of April 25 was made, Dr. Bain visited California in May, 1922, for the purpose of arranging for the turning over to the Pan-American Petroleum & Transport Company the accumulated oil that had been collected from the reserves during the negotiations that led up to the April 25 contract. He encountered serious opposition by the oil companies that had been receiving the oil under earlier arrangements, and the companies were threatening litigation to test the validity of the April 25 contract. In this dilemma he prepared a letter to Secretary Fall, as follows:

"506 Custom House, San Francisco, California,
"May 12, 1922.

"Hon. Albert B. Fall, Three Rivers, N. M.—Dear Mr. Secretary: I have been here for the last few days arranging for a transfer of the accumulated royalty oil and future royalty oils to the Pan-American Company. I have been surprised to find that the Standard and General Petroleum in particular are adopting a very technical attitude toward this transfer, going so far as to raise a question as to whether either company would be safe in making such a transfer or in later handling any of the oil in case the Pan-American desired to have them do so. As you will recall, Mr. Sutro and Mr. Wyle have been doubtful as to the right of the department to make the exchange contract. They now seem to have become positive that no such right exists, and Mr. Story is even interpreting the law so far as to question the right of the Standard to deliver oil to the Pan-American on our order. I have arranged that Mr. Campbell, as representing the department, shall receive the oil and give a receipt for it, and while I am not a lawyer, my impression is that that should end the matter as far as the pipe line companies are concerned. Of course, this is not a matter which primarily concerns the department, since we have all been entirely clear in our minds as to the right of the government to make this exchange, and have in fact gone ahead and contracted for the exchange with the Pan-American, and the latter is an entirely responsible concern; that I assume ends it as far as we are concerned.

"There is, however, another phase of it. None of us want Mr. Doheny to get into trouble, and I take it we will want to do anything we can to make it easy for him. I have been told that there was a definite proposal to have one of the smaller companies go into court and fight this contract with a view to getting a decision as to the right of the department to make such a bargain. This proposal was not carried through. Mr. Story tells me that he objected to it, as he felt that it would embarrass the department and would give support to the trouble makers in Congress. He professed to be anxious and willing to do anything he can to help the department to carry out its plans, but to be in the awkward position of having an opinion from his attorney which might be quoted against him in case the matter ever came up.

"Out of all this has come the suggestion repeatedly that the opinion of the Attorney General be obtained as to the legality of the contract. I realize the objections to asking such an opinion, but I have thought it proper to let you know the difficulties that are being raised here, so that you might reconsider the matter and decide as to whether you might not properly ask the Attorney General to put in writing what I have understood was his informal and verbal expression of opinion favorable to the action the department has taken. I am not certain that Mr. Doheny cares, but Mr. Cotter will see him to-morrow, and if it does not seem to them important I am giving Mr. Cotter this letter to show you, so that you may know what I have found out here.

"The wells on the north line of 2 are coming in in good shape, and Anderson has done excellent work in pushing them ahead. I am sorry to bother you with this business while you are at home.

"Cordially yours,
"H. Foster Bain, Director.
"% Mr. A. W. Ambrose."

Dr. Bain did not mail this letter, but gave it to Mr. Cotter, who was also in California; and although Mr. Cotter did not testify, it appears that the letter never reached Secretary Fall, as Mr. Cotter told Dr. Bain afterward that he had talked the matter over with Mr. Doheny, and that Mr. Doheny said that the matter was unimportant, and that he was satisfied with the authority to go ahead. Here is a clear and unmistakable manifestation on the part of Mr. Doheny that he was determined to retain this valuable and unusual leasehold right to the naval oil reserves, and that he was not willing to hazard

the venture by any litigation, or by even the solicitation of an opinion from the Attorney General as to the legality of the contract. This situation alone, in my opinion, negatives the idea which counsel for defendants suggested that Mr. Doheny's interest in this matter was primarily patriotic. Mr. Doheny by this position showed that in May, 1922, at least, he was looking forward and anticipating the valuable and extensive lease that he later obtained on December 11, 1922. The contract of April 25, 1922, meant no profit to him. The lease of June 5 was not valuable. It was small in area and was coexistent with the April 25 contract. It was the preferential right to further leases, granted by the April 25 contract, that Mr. Doheny expected would fructify into a valuable property right. He was not desirous or willing to risk what he knew the future would bring to him because of his ownership of the preferential right. If the contract which gave him that right would not stand the legal test, he would be unable to effectuate any plans for the future; and he wisely decided to let well enough alone as to the legality of the April 25 contract.

There are some other details in connection with the contract of April 25, 1922, and the lease of June 5, 1922, that are significant in the consideration of the first general contention of the plaintiff in this case, and they have been covered by the findings of fact and conclusions of law filed simultaneously with this opinion. Further mention herein I deem unnecessary.

[19] We are therefore brought to a consideration of the contract and lease of December 11, 1922. I shall not review much of the record relative to the execution of these agreements. They are inextricably bound to the April 25th contract, and all of the agreements are component parts of a plan to lease the naval oil reserves and to use the royalty oil coming to the United States therefrom. If the plan was tainted by the personal and money transactions of Secretary Fall and Mr. Doheny, all of its parts are infected.

No competition of any kind was attempted by any department of the government with respect to the agreements of December 11. There was no immediate drainage condition that justified them. The only officer of the government who participated in the making of the contract or lease under the theory that it was a present drainage relief measure was Secretary Denby, and he was misled in this regard. There was secrecy in the negotiations that led up to the execution of these

agreements and in the actual consummation of them. The royalties that were to be required to be paid to the government under the lease were not as favorable to the government as those which had been obtained for leases on reserve No. 2 about this same period. The contract and lease cannot be justified upon any national emergency demand, for there is no evidence that any existed at the time these agreements were made. These contracts, in my opinion, were in furtherance of the plan of Secretary Fall, formed by him soon after he assumed the Interior portfolio, to lease the entire naval reserves of the nation to private enterprise. They were also to effectuate the understanding which I believe the telling letter of November 28, 1921, shows existed between Secretary Fall and Mr. Doheny to grant privileged leases to the defendant companies.

Shortly after the April 25 contract was made, Admiral Robison called the attention of the officers of the Navy to the desirability of increasing the Pearl Harbor reserve fuel station, and also the necessity of increasing the reserve stocks of fuel oils and lubricating oils, together with the necessary storage facilities therefor. Little attention was paid to his suggestion at that time. He, however, was determined to accomplish his incessant desire to strengthen the nation's defense by building and equipping additional fuel stations, by using naval oil therefor. And again on November 20, 1922, he wrote to the Bureaus of the Navy that had direct supervision of such matters, as follows: "The storage for 1,500,000 barrels of fuel oil at Pearl Harbor under contract with the Pan-American Petroleum & Transport Company is nearing completion, and it is desirable at this time that information be at hand as to what further disposition should be made of the royalty oil accruing from naval petroleum reserves Nos. 1 and 2."

On the following day Admiral Robison received authority to proceed with the enlargement of the Pearl Harbor project, so as to provide additional fuel oil storage facilities and also a separate unit for gasoline storage.

In the meantime the Interior Department had been solicited by the Pan-American Petroleum & Transport Company to extend some relief from their leases in the naval oil reserves on account of the flush production of crude oil occasioned by the opening up of newly discovered fields in California and insufficient refinery facilities therein, which had resulted in greatly depreciating the market price of oil. On July 28, 1922, Mr. Cotter wrote to the Secretary of the Interior, requesting that his company be permitted to curtail production and cease drilling. He suggested that his company hoped to be able to submit a plan to the Secretary of the Interior to bring better prices for the oil. There are two important features of this letter shown by the following excerpts:

"We are seriously contemplating the adoption of a plan which should bring better prices for this oil, if and when the plan can be consummated. In order that this plan may be developed, it is essential that we should have immediately your consent for suspension of operations, both drilling and pumping, on lands which we have leased from both within and without the naval reserves. This suspension of operations may be made to such an extent as not to include offset wells, but license to make it complete is necessary in order that development of the contemplated plan may be attempted. * * *

"We believe that, if this oil can be safely stored underground, better prices which the future should develop will result, and bring out the liquidation of contract prices in approximately the same length of time with a much smaller quantity of oil. We hope that you will see your way clear to authorize us to suspend operations both of drilling or production, or either, to such extent as we may find it necessary in connection with the study of our proposed plan, until such time as said plan can be fully developed and submitted to you for your study and approval. We hope to be able to submit this plan within 90 days. To enable us to commence the initiation of the plan which we have in mind, and to avoid the menace of possible failure to fulfill our leases, specific telegraphic authority to discontinue operations, followed by a mail confirmation, is hereby earnestly requested."

This request was immediately granted by Secretary Fall. The prevailing market conditions made increased drilling in the naval oil reserves unnecessary. The program of commercial oil companies was to curtail production as far as possible, and thus relieve the unsatisfactory market condition, so that a reasonable market price could be reestablished. It is also clear that the Navy's policy of keeping the oil underground was particularly helpful to the general market condition that prevailed during the summer of 1922. These unsatisfactory market and inadequate refinery conditions afforded further opportunity to favor the Pan-American Petroleum & Transport Company, by put-

ting into operation its preferential right to oil leases in the naval reserves, so that the Pan-American Petroleum & Transport Company might carry out its plan to establish a California refinery. If additional refinery facilities could be provided, the overproduction of crude oil could be transformed into other petroleum products and the general market condition stabilized.

As it was, however, there was neither excuse nor justification for putting into operation the valuable preferential right granted by the April 25 contract, so that an enlarged or modified plan had to be brought forward, in order to attain the end agreed upon between Mr. Doheny and Secretary Fall as early as November 28, 1921. Shortly after Mr. Cotter's letter of July 28, Mr. Doheny returned from a summer outing in Alaska, and on September 6 he wrote a very friendly letter to Secretary Fall, in which he made the following statements:

"I am greatly pleased to note that the authority which you gave to your representative at Bakersfield, Mr. Campbell, has worked out some good results in connection with the temporary flood of oil which has increased the production beyond the capacity of the refineries in this state. The need for storing this surplus is undoubtedly the cause of the decrease in the price of oil, inasmuch as oil purchased in excess of the capacity of the refinery must be stored by the purchaser at a cost of 35 cents to 50 cents per barrel over the cost of such oil as may be treated immediately and find its way into the market.

"In connection with this situation I have developed some ideas which I desire to place before you, which I think will work out to the advantage of the government and the oil producers, generally, in this state. I am preparing a statement of the situation here, and of the plan which I would like, under certain conditions, to undertake to carry out, which will give relief of a substantial character and provide additional market for the flush, unrestricted production of the oil fields here."

When Mr. Doheny and Secretary Fall met and discussed the plan mentioned by Mr. Doheny is not disclosed by the record in this case. There is nothing from which it is possible to fix definitely the time of any discussion between them concerning this new plan. It is certain, however, that they did discuss the matter, and probably before it was discussed by any other persons concerned. Mr. Doheny arrived in the East shortly after the letter was written, and in the latter part of October, 1922, he also called upon Admiral

Robison, to whom he disclosed the plan, and with whom he discussed it on at least two different occasions before the contract of December 11, 1922, was made.

In substance his plan, as imparted to Secretary Fall and Admiral Robison, was to increase the storage facilities at Pearl Harbor and to provide for additional oil storage facilities for the Navy elsewhere of from 2,000,-000 to 5,000,000 barrels, and to fill the same with fuel oil as a reserve, and in addition to furnish and sell to the Navy manufactured oil products from the refinery at 10 per cent. less than market prices at tidewater. The plan further provided that the Pan-American Petroleum & Transport Company would erect an oil refinery at San Pedro, or at some other tidewater point, in California, and construct a pipe line from the naval oil reserves in California to the refinery, and convey the oil from the reserves through the same, and that in consideration of these undertakings the government would, under the preferential right to lease granted under the April 25 contract, immediately lease to the Pan-American Petroleum Company all of the unleased portions of naval reserve No. 1, excepting a certain area upon which no leases would be granted to any concern, and would authorize immediate extensive and general drilling thereon.

The agreement proposed was to continue for 15 years after the completion of the Pearl Harbor construction. It was in effect a complete surrender and transfer of approximately 30,000 acres of valuable proven oil land and its oil contents, estimated at from 75,000,000 to 250,000,000 barrels of oil, for 15 years at least. Some idea of the value of this concession, granted secretly, privately, and without a semblance of competition, is obtained from Mr. Doheny's testimony before the Senate committee that he expected his companies to make a profit of $100,000,-000 from it.

As a result of Mr. Doheny's conversations with Admiral Robison, the plan was discussed by officers of the Navy and Interior Departments, and a contract embodying the terms of the contract of December 11, 1922, was agreed upon, and it was also agreed that a lease such as that proposed would be granted to the Pan-American Petroleum Company in accordance with the contract. This lease was made on the same day as the contract. Although this contract for additional storage facilities for nearly 1,500,000 barrels of oil at Pearl Harbor was entered into on December 11, 1922, the plans for such additional construction were not prepared until

long after that date. There seems to have been unnecessary alacrity in effectuating the contract and lease of December 11, 1922.

The negotiations were proceeding smoothly after the conferences between Admiral Robison and Mr. Doheny, when a barrier confronted consummation of the plan in the formal execution of the contract and lease contemplated. This obstacle was the all-important question as to what royalties would be paid by the Pan-American Petroleum Company under the lease. Admiral Robison insisted upon a higher royalty than the officers of the Pan-American Companies would agree to pay, and in this situation Dr. Bain prepared a compromise schedule of royalties, which were not as high as those demanded by Admiral Robison, nor as low as those contended for by Mr. Doheny. Dr. Bain's schedule was taken to Secretary Fall, and Secretary Fall was advised as to the difficulty that existed. He personally got in touch with Mr. Doheny, and submitted the compromise proposition to him, and, while unable to obtain Mr. Doheny's consent to Admiral Robison's royalties, he did secure Mr. Doheny's acquiescence in Dr. Bain's compromise schedule of royalties. We have no way of knowing the conversations that occurred between Secretary Fall and Mr. Doheny with respect to this controversy, but we do know that Secretary Fall informed Admiral Robison that he had discussed the matter with Mr. Doheny, and had submitted Dr. Bain's compromise schedule, and had obtained Mr. Doheny's consent thereto.

Admiral Robison, however, was not ready to agree to accept the royalties which were tentatively agreed to by Secretary Fall and Mr. Doheny, and a meeting between Admiral Robison and Mr. Doheny took place, wherein Mr. Doheny with some chagrin stated that he would not agree to any higher royalties than those suggested by Secretary Fall; and Admiral Robison, fearful that the entire plan would miscarry, finally agreed to accept the royalties that were satisfactory to Mr. Doheny, and these are the royalties specified in the lease of December 11, 1922. It is the royalties specified in this lease that determine the value of the lease and of the companion contract of December 11 to the defendants, and it was Secretary Fall who finally decided and actually fixed the royalties therein. Secretary Denby personally took no part in the negotiations and never read the contract thoroughly. He relied entirely upon Admiral Robison. He had never met Mr. Doheny until the time that he signed the contract on December 11, 1922, when Admiral Robison introduced Mr. Doheny to him.

This lease assured the defendants a sufficient supply of oil to enable them to enter the refinery business in California. The contract and lease of December 11, 1922, were made, as far as Admiral Robison was concerned, to extend his desire to strengthen the national defense by utilizing oil from the naval reserves, and on the part of Secretary Fall and Mr. Doheny they were made to effectuate the preferential right given to the Pan-American Petroleum & Transport Company by the contract of April 25, 1922, and to enable that company to obtain control of practically all of naval petroleum reserve No. 1. The motive and plan of Secretary Fall concerning the lease of December 11, 1922, is illuminated by his correspondence with citizens and concerns who were anxious to know whether it was his policy to grant leases in the reserves. Many of these persons wrote to him during the year 1922, and as late as the latter part of October therein, and requested information as to whether it was possible to obtain oil leases in the naval oil reserves. To all of these inquiries he stated that the policy of the Interior Department was to grant no leases in the reserves, except such as were absolutely necessary in order to protect the reserve from drainage by outside drillings. These statements were certainly not in accord with the truth. He was at this time considering leasing the entire reserve No. 1 to the Pan-American Petroleum & Transport Company, and the contemplated lease had no drainage aspect.

To sustain these contracts and leases, in view of the multitude of irregularities, favoritisms, discriminations, improprieties, and wrongs shown by the record in this case, is more than this court can do. Some of the specific means alleged to have been employed by Secretary Fall and Mr. Doheny to consummate the conspiracy have not been proven by the evidence in this case, but in general the allegations of fraud and conspiracy have been established. In my opinion it has been clearly proven that as early as November 28, 1921, there was a secret, definite understanding, arrangement, and agreement between Secretary Fall and Mr. Doheny that the companies controlled by Mr. Doheny would be given extensive and valuable oil leases in the naval petroleum reserves, in the consideration of the building of the storage facilities at Pearl Harbor, Hawaii, and the filling of the same with fuel oil, and that all of the contracts and leases in controversy in this

suit were and are the outgrowth, development, and accomplishment of such secret plan.

My conclusion upon the issue of fraud and conspiracy is that the charge thereof alleged in the amended bill of complaint has been sustained, and that the contracts and leases involved in this controversy must be canceled, annulled and set aside.

I now consider the second ground of attack against the contracts and leases in suit. The allegations of the amended bill of complaint, in so far as this second ground of attack is concerned, are, generally, that the contracts of April 25, 1922, and December 11, 1922, and the leases of June 5, 1922, and December 11, 1922, respectively, were made without any legal authorization therefor; that is to say, that there was no law of the United States which authorized any officer of the United States to enter into any of such contracts or leases, so as to make them or any of them binding and enforceable obligations of the United States, and consequently that they are, and each of them is, absolutely void and of no legal force or effect whatever. In discussing this phase of the case it will be assumed that the official authorized by the wording of the Act of June 4, 1920 (41 Stat. 812), actually made the contracts and leases, notwithstanding this court has determined that such was not the fact. It is the legal power of the Secretary of the Navy under the Act of June 4, 1920, that is to be considered, and, in the consideration of it, it will be assumed that the Secretary of the Navy in fact exercised such power.

The precise question for decision is whether any law of the United States authorizes the officers of the government of the United States to exchange royalty crude oil and gas due to the United States from oil and gas leases on lands within the naval petroleum reserves for fuel oil for naval use and for the storage facilities in which to contain and reserve such fuel oil for use by the Navy. If it be determined that there exists any law empowering the government to accomplish such an exchange generally, the next and ultimate question is whether the particular contracts and leases in controversy in this case are valid and enforceable executions of such power.

The validity of the agreements in suit rests entirely upon the scope, terms, and effect of four provisos annexed to the Naval Appropriation Act of 1920, which have been referred to throughout the trial of this case and in the briefs of counsel as the Act of

June 4, 1920, and such designation will be continued herein. The act is as follows:

"Provided, that the Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under the provisions of an act of Congress approved February 25, 1920, entitled 'An act to provide for the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain,' or pending applications for United States patent under any law; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: And provided further, that the rights of any claimant under said Act of February 25, 1920, are not affected adversely thereby: And provided further, that such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,000, are hereby made available for this purpose until July 1, 1922: Provided further, that this appropriation shall be reimbursed from the proper appropriations on account of the oil and gas products from said properties used by the United States at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct." Section 1 (41 Stat. 812 [Comp. St. Ann. Supp. 1923, § 2804i]).

My attention has been called to no ruling or decision of any court in which this act of Congress has been considered, interpreted, or construed. In order to ascertain the intent as well as the scope of this law, consideration should be given to the legislative history relating to the naval petroleum reserves and leading up to the passage of this statute. The lands now known as the naval petroleum reserve No. 1, in which all of the oil-bearing lands involved in this suit are located, were carved out of the public domain and set apart for naval reserve purposes by an executive order of the president of the United States promulgated September 2, 1912. In this order it is stated that these lands "shall be held for the exclusive use and benefit of the United States Navy." Prior to the promulgation of this executive order the lands had been withdrawn from public entry by another executive order of

the President of the United States in 1909. While the lands were segregated for the use of the Navy by these executive mandates there had been provided no legislation whereby any of the withdrawn lands could be used or occupied until the Leasing Act of February 25, 1920 (41 Stat. 437), was passed. This Leasing Act authorized leasing of lands in the naval oil reserves in settlement of pre-existing claims under the placer mining laws of the United States.

It has been previously noted that the only provision in the Leasing Act of 1920 as to the use and disposition of royalty oils accruing to the United States from leases made under said act was that the Secretary of the Interior, "except whenever in his judgment it is desirable to retain the same for the use of the United States," shall offer the royalty oil and gas for sale at public auction. In cases where no satisfactory bid was received, he then might readvertise such royalty oil and gas for sale, or might sell the same at private sale at not less than the market price, or he might accept the value thereof from the lessee. The Leasing Act further empowered the Secretary of the Interior, pending the making of a permanent contract for any sale of royalty oil in accordance with the provisions of such act, to sell the current product at private sale at not less than the market price. Section 36, Act Feb. 25, 1920, supra (Comp. St. Ann. Supp. 1923, § 4640¼rr).

The Secretary of the Interior was therefore given by this Leasing Act of 1920 but two alternatives as to any royalty oil and gas within or produced from the naval oil reserves. He could either retain it for the use of the United States or sell it. The power to retain the royalty oil and gas for the use of the United States was neither substantial nor practicable, because the Secretary of the Interior had no storage facilities in which the oil could be retained after production. This power was illusive and fictitious. Moreover, the royalty crude oil could not be satisfactorily used, except in the course of some exchange, or other disposition, as to which no specific powers were granted by law. The crude oil, as such, could not be used by the Navy. It was unsuitable to any naval use. It was therefore of the utmost importance, if the naval oil reserves were to be such in fact as well as in name, that some remedial and enabling legislation be provided immediately, in order that the Navy might really and actually be the beneficiary of the oil reserves of the nation which were set apart by Congress for the Navy's

use. This purpose had not been accomplished by the Leasing Act, or by any other existing legislation, as under all acts prior to the Act of June 4, 1920, the right to deal with these reserves was strictly limited, without any consideration being given to the interest of the Navy, and even the royalty oils due to the government from leases to land within the reserves were handled on a purely commercial basis. There was no real naval use authorized by law.

These reserves, while legally carved out of the contiguous and adjacent lands, are nevertheless physically inextricably connected with such lands. The line of demarcation exists only upon the surface of the reserves. The fugitive mineral, which makes the reserves of any value or use to the Navy, cannot be confined within the limits of the reserves as long as those who own or operate the contiguous areas of land extract oil and gas by drilling wells upon their lands. There had been, prior to the passage of the Act of June 4, 1920, much development of such adjacent lands. Many wells were drilled on such lands, and many of them produced oil and gas in great quantities and continuously. This condition was necessarily menacing to the naval petroleum reserves, because it had been scientifically determined that much of the oil and gas in the reserves was being drained into the private property of the adjacent lands, and there was no way by which such oil could be recovered. Even defensive measures to protect the oil and gas within the reserves were impossible, as there was no law under which such measures could be justified. Necessary offset wells could not be drilled, and if conditions respecting the reserves had continued as they were before the passage of the Act of June 4, 1920, the reserves would ultimately have been depleted, and the Navy would not have received any benefit whatever from them. So until the Act of June 4, 1920, there was no comprehensive or adequate scheme for administering the naval reserves so that the Navy might be the recipient and beneficiary of these reserves and their products. There was no way by which the object for which these oil lands were carved out of the public domain could be attained.

It is apparent, therefore, from a study of the legislation in effect prior to the enactment of the law of June 4, 1920, and the known physical and geological conditions as shown by the evidence in this case, as well as from a consideration of the words and terms of the statute of June 4, 1920, that Congress intended by it to construct a com-

plete and comprehensive legislative scheme broad enough to cover all matters in connection with naval reserve affairs, and to supplant all previous congressional action with respect to the control of the naval petroleum reserves of the United States. The paramount intent was to preserve the reserves for the use of the agency of the government for which they had been set apart, and to invest the head of such agency of government with plenary power to control and administer these reserves as his discretion would dictate and for the benefit of the United States.

[20] The statute, therefore, being remedial, is to be liberally and not strictly construed by the court in order to carry out and effectuate the legislative intent. Stewart v. Kahn, 11 Wall. 493, 20 L. Ed. 176; Hamilton v. Rathbone, 175 U. S. 414, 20 S. Ct. 155, 44 L. Ed. 219; Harris v. Bell, 254 U. S. 109, 41 S. Ct. 49, 65 L. Ed. 159. If possible, a remedial law must be construed in such a way as to effectively accomplish the legislative purpose. Harris v. Bell, supra.

[21] Our entire object must be to ascertain the intention of the Legislature and the ill intended to be remedied, and in the ascertainment of such intentions and in order to give the law in question a proper construction the court may look into prior and contemporaneous acts, the reason which induced the act in question, the mischief to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by the statute. Hamilton v. Rathbone, supra.

[22] And in construing a remedial statute, such as the Act of June 4, 1920, in the absence of clear necessity to the contrary, the words and language of the law must be interpreted and applied in their ordinary usage and meaning. De Ganay v. Lederer, 250 U. S. 376, 39 S. Ct. 524, 63 L. Ed. 1042; Dewey v. United States, 178 U. S. 511, 20 S. Ct. 981, 44 L. Ed. 1170; U. S. v. First National Bank, 234 U. S. 245, 34 S. Ct. 846, 58 L. Ed. 1298.

[23] The particular words in the Act of June 4, 1920, which it is necessary to construe in this case, are "exchange" and "store." The power to "store" was exercised in this case primarily through the operation of an exchange, so the crux of this controversy is the extent and scope of the "exchange" power. The ordinary meaning of the word "exchange" is: "A contract by which the parties mutually give, or agree to give, one thing for another, neither thing, or both things, being money only." Civ. Code Cal. § 1804. In the contracts now before the court the parties exchanged crude oil taken from the naval petroleum reserves for fuel oil and other petroleum products usable and necessary for naval use and necessary storage facilities by which such fuel obtained by the exchange could be possessed and reserved for use by the Navy.

The plaintiff asserts that under the Act of June 4, 1920, this cannot be done. The contention is that crude oil may be exchanged under said act only for fuel oil or some form of petroleum products derived from crude oil; that the storage facilities or containers contracted for cannot be obtained under the exchange power or any other power conferred upon the Secretary of the Navy by this law. I am unable to agree with such contention. In taking this position plaintiff reads into the meaning of the word "exchange" something that is not found in the Act of June 4, 1920, or in the meaning of the word itself. The word is employed in the statute in its ordinary sense, without any limitation, explanation, or qualification, and plaintiff is not justified in imposing, or inserting, or reading into the law, anything. The plaintiff's concession that crude oil may be exchanged for fuel oil destroys the force of the contention, because there is nothing in the statute which justifies the exchange of crude oil from the reserves for fuel oil, to the exclusion of any other commodity usable for naval purposes for the benefit of the United States. Why crude oil can be exchanged for fuel oil, but not for commodities and facilities necessary to store and to use such fuel oil, I fail to see.

The exchange power granted by the Act of June 4, 1920, is general, unrestricted, and plenary. Its only limitations are the discretion of the Secretary of the Navy and the benefit of the United States. As long as the power was exercised within these two limitations, it was unquestionable. The word implies no other meaning in the statute, and Congress could have intended nothing less. This construction is reinforced when the other provisions and verbiage of the statute are examined and considered. The act was a broad grant of power from Congress to the Secretary of the Navy to administer, control, and use these reserves in any manner that his discretion dictated, in order to make them actually petroleum reserves for the use of the Navy and the benefit of the United States. The Congress appropriated and set aside for the use of the Navy, not only the lands and their petroleum contents, but it also additionally appropriated and set

aside $500,000 in money, which it gave the Secretary of the Navy the right to use until July 1, 1922, in connection with his general power of administration and control of the reserves for the benefit of the United States. The grant of power, as well as the discretion to be exercised by the Secretary of the Navy in executing this grant under the Act of June 4, 1920, extends to all points and conditions connected with the naval reserve lands, and the handling, use, and disposition of the government direct and royalty products therefrom, either by selling the production, or by exchanging the products immediately on production, or afterward, for the purpose of giving and securing to the Navy a supply and reserve of fuel oil or other petroleum products necessary for the Navy and beneficial to the United States. Anything done by the Secretary of the Navy in good faith to attain these purposes is lawfully done, within the comprehensive, plenary, and exclusive Act of June 4, 1920.

If this exchange power is unlimited, then no reason can be assigned why all things entering into an exchange should be confined upon the lands of the naval petroleum reserves. The United States is more benefited by effecting an exchange of the royalty crude oil for fuel oil delivered at points where the fuel oil can be used by the Navy than by retaining the oil obtained in the exchange upon the lands of the reserve. The purpose and intent of the lawmaker was to not only establish and create a naval oil reserve, but to do so in a practical, effective, and useful manner. It is certainly unreasonable to assume that it was intended that the oil and petroleum products of the reserve should always be kept inland and underground. If plaintiff admits that the royalty crude oil can be exchanged for fuel oil under this law, then he must go a step further and admit that a receptacle necessary to hold the fuel oil can be received in the exchange, and if the container can be received and utilized upon the lands of the reserve, there is no reason apparent to me why the fuel oil and its container cannot be received at some other point. This seems to me to be not only implied from the power to effect the exchange, but the law expressly authorizes it to be done, by giving the Secretary, the power to "store" the oil and its products.

But it is said that it cannot be supposed that it was within the intention of Congress to allow the Secretary of the Navy to render so large a portion of the Navy's crude oil unavailable for fuel purposes of the Navy as the amount which is required under the exchange provisions of the contracts to be delivered in consideration of the construction of the additional storage facilities at Pearl Harbor, as distinguished from the fuel oil to be delivered into such storage facilities when completed. But plaintiff forgets that before this Act of June 4, 1920, became law all of the royalty oil from these naval reserves was being sold, and was therefore totally unavailable for direct naval use or national defense, either as fuel or otherwise. Moreover, under this new law the power to sell the royalty crude oil still exists as completely as before, and surely Congress did not intend to subtract from or reduce the power to dispose of this royalty crude oil, but, on the contrary, manifestly intended to enlarge and extend the power.

The money appropriation clauses do not affect in any manner the general investiture of the exchange and storage powers. This is not only apparent because of the words of the statute, but also because it would be absurd to say that the Congress intended to provide for the conservation and safeguarding of the reserves only until July 1, 1922. The main purpose was to correct and to remedy an evil that existed in the management and control of this property. Correction or remedy for two years would be insufficient. The evil to be remedied was permanent and becoming progressively worse, and it is certainly not to be held that the small amount of money appropriated was considered adequate to attain the main purpose of the law. The whole statute must be given effect, if this can be done. It cannot be done by limiting the exchange power of the Secretary of the Navy by the money appropriation. It would then provide for merely a temporary reserve, which in reality would amount to no reserve at all. An oil reserve inherently and necessarily pertains to a future use.

[24] There are certain provisions in the contracts in controversy that clearly manifest the intentions of the parties in making such contracts, and which must be considered in determining whether such parties actually and legally made an exchange contract by the agreements in suit. In the contract of April 25, 1922, it is stated: "It is the intention of the parties hereto to effect an exchange of crude oil which is unsuitable for fuel for the United States Navy, and which is produced from naval petroleum reserves in California, * * *

for fuel suitable for the use of the United States Navy, to be delivered by the contractor at the United States naval station at Pearl Harbor, territory of Hawaii, * * * into storage facilities to be constructed and erected by the contractor." And in the later contract of December 11, 1922, which was in part an enlargement and extension of the April 25 contract, it is also provided that: "Whereas, a certain contract was entered into by the above-named parties dated April 25, 1922, providing for the exchange of royalty crude oil belonging to the government and produced from naval reserves Nos. 1 and 2 in the state of California for fuel oil in storage at Pearl Harbor, T. H., including tanks and incidental facilities; * * * and whereas, said contractor has expressed a willingness to furnish the desired amount of fuel oil and other petroleum products in storage for crude oil in the field," etc. And further in article II of the contract of December 11, 1922, it is stated that: "For the consideration herein mentioned and contained, to wit, the furnishing of oils in storage and facilities and options as specified above, the government agrees to deliver in exchange to contractor all royalty oil," etc.

There is no language in either of the contracts indicative of an intention on the part of the parties thereto to effectuate an arrangement wherein cash or money would be transferred between the parties, except an option retained by the government, effective after the completion of the Pearl Harbor project and other projects under the December 11 contract. This option had no relation to the exchange elements of the contracts. There are terms used in the contracts which imply that in arriving at the basis of the exchange agreements certain pecuniary computations are made but under the decisions of the federal courts this method of ascertaining the quantum of the things sought to be exchanged does not destroy the exchange quality of the contracts.

But the plaintiff has earnestly contended that, assuming that the Act of June 4, 1920, grants to the Secretary of the Navy the power to exchange the royalty oil in the reserves for fuel oil and storage facilities, the contracts of April 25, 1922, and December 11, 1922, respectively, are not exchange contracts, but in reality sales of the royalty oil. Plaintiff says that the April 25 and the December 11 contracts were not true contracts of exchange, because no final fixed quantity of either crude oil or

fuel oil was definitely specified as the maximum amount which was deliverable by either party to the other.

The provisions of the April 25, 1922, contract in this regard, stated generally, are: That on April 25, 1922, the price of crude oil in the field was $1.10 per barrel, and the price of fuel oil at the same time at the California coast was $1.50 per barrel. It was understood and agreed that deliveries of fuel oil would be made by the contractor at different times thereafter, and that the price thereof might at the date of delivery of a given quantity vary from the reference price of $1.50 specified in the contract. It was also stated that the delivery of royalty oil would be made at various times until the cost of the Pearl Harbor storage and the fuel oil to fill it was defrayed, and that at such times the published field price of such royalty crude oil might also vary from the specified reference price of $1.10 per barrel, and therefore, in order to protect the interests of both parties to the contract, and avoid making a purely gambling contract, it was provided that the quantities of crude oil delivered on the one hand and of fuel oil delivered on the other should be subject to change from amounts originally estimated; such change being proportionate to the changes in price above stated of these respective commodities.

And with respect to the December 11, 1922, contract, inasmuch as it differed from the April 25 contract in having no proposal sum of barrels of royalty crude oil for which the contractor agreed to do those various things mentioned in the December 11 contract, provision was made in said December 11 contract that all royalty crude oil delivered to the contractor according to the contract should be delivered at published field price on day of delivery, and that all fuel oil delivered by contractor to the government should be delivered at the market price thereof at the respective dates of delivery at California shipping points, plus the going rate for transportation to Pearl Harbor, Hawaii. In other words, both contracts contemplated practically certain changes in the price or market value of the two commodities to be delivered during the lives of the contracts, respectively, and accordingly made the quantities respectively deliverable in final adjustment of the obligations of the parties depend upon the extent of the price changes.

[25] As I have said, it is clear, however, that no provision in either contract

contemplates or implies the payment of any cash by either party to the other at any time or under any circumstances, in connection with the proposed charges, whatever may be the fact as to the differences in the valuation of the commodities involved. There is a provision in the December 11 contract in which the government is given the right to take the equivalent of the royalty crude oil delivered in cash, instead of fuel oil and storage facilities. This option applies only after the Pearl Harbor project under both the April and December contracts has been completed, and if it does destroy the exchange feature of this contract it does so only upon the entire completion of the Pearl Harbor project under both contracts, and would only vitiate the December contract to a limited extent, and not totally, and as no attempt has been made to effectuate such provision or option its effect is immaterial in this case. McCullough v. Smith, 243 F. 823, 156 C. C. A. 335; Burke v. Southern Pacific Co., 234 U. S. 669, 34 S. Ct. 907, 58 L. Ed. 1527. Except as just stated, these two contracts provided that, while the quantity of the commodity was dependent upon price changes, there was never to be delivered by either party to the other anything but property of the kind and quality specified in the contracts,° and under no circumstances or conditions, except as stated, was any payment of money to be made.

This claim of plaintiff that the determination of the quantity of the commodities to be delivered by reference to varying market prices of the two kinds of petroleum products transformed the arrangement embodied in the contract from an exchange to a sale on the one hand of royalty crude oil, and a purchase on the other of fuel oil and of storage facilities, is untenable. The Supreme Court of the United States, in Postal Telegraph-Cable Co. v. Tonopah & Tidewater Railroad Co., 248 U. S. 471, 39 S. Ct. 162, 63 L. Ed. 365, has held that contracts similar and analogous to the contracts of April 25, 1922, and December 11, 1922, were exchange contracts. This case and those in the lower federal courts from which it arose cannot be distinguished in principle from the case at bar. The contract under consideration in Postal Telegraph-Cable Co. v. Tonopah & Tidewater Railroad Company, supra, was one where, inter alia, the telegraph company agreed to transmit free of charge all railroad business telegrams between all points on the railroad, and also agreed to issue to

the railroad officers annual franks for railroad messages to points off the railroad lines to an amount not exceeding $10,000 per annum, calculated at the regular day rates, and the railroad company agreed to transport free of charge the employees, materials, and supplies of the telegraph company to points on its lines, and also to transport free of charge the employees, materials, and supplies of the telegraph company to points off the lines to an amount not exceeding $10,000 per annum, calculated at current transportation rates. The question arose as to whether such a reciprocal arrangement constituted a true exchange contract of services, within the meaning of section 1 of the Interstate Commerce Act, as amended in 1910 (Comp. St. § 8563).

The situation shown by this telegraph-railroad contract is almost the identical situation established by the contract of April 25, 1922, and of December 11, 1922. The engagement in the cited case was not for the transportation of a given number of men or a given number of tons of freight, on the one hand, and a given number of telegrams, on the other, but in each case the quantum of the service to be rendered was to be fixed by reference to a changeable cash standard; that is to say, such amount of service as based upon the cash standard for the unit of service should equal a given aggregate sum. In the course of this opinion Justice Holmes said: "'Exchange' is barter, and carries with it no implication of reduction to money as a common denominator. It contemplates simply an estimate, determined by self-interest, of the relative value and importance of the services rendered and those received." In other words, the Supreme Court held that the parties may exchange without necessarily making any reference to money, but if they desire they may estimate the value of the respective things involved in any manner which "self-interest" may determine.

In Baltimore & Ohio Railroad Co. v. Western Union Telegraph Company, 242 F. 914, 155 C. C. A. 502, the court was considering whether a contract identical with the one in the Tonopah Railroad Case, supra, was an exchange contract for services. In pointing out that the placing of a money valuation upon the properties exchanged or to be exchanged does not convert the transaction into a sale, in the absence of such an intention between the parties, it said: "In our opinion (in the

absence of fraud) the right to exchange implies the right to fix the rate, method, or amount of exchange. The agreement being to exchange the carriage of goods against the transmission of intelligence, each party has the further right to fix the value of the services of each to the other; it makes no difference whether for convenience they ascertain that value by the usual money measurement or adopt some other course.''

[26] It cannot be truthfully said that an exchange becomes a sale whenever one of the things exchanged is valued. An exchange is always an exchange, when things other than money are transferred in consideration of other such things, whether or not either or both of the things have or are given by the parties a money value. If the engagement embodied in the contracts in suit should be held to be a sale, it would still be within the terms of the Act of June 4, 1920, because that statute gave to the Secretary of the Navy the power to sell the royalty oil, as well as to exchange it. I am of the opinion, however, that the contracts are exchange contracts. It was not only the intention of the parties to make them exchange contracts, but under the authorities cited they must be held to be exchange contracts.

The final contention of plaintiff is that the contracts and leases involved in this action are illegal and void, and should be annulled, because in them the Secretary of the Navy has surrendered, relinquished, and delegated to the Secretary of the Interior essential and vital powers, which are vested solely in the Secretary of the Navy by the Act of June 4, 1920. This question depends to some extent on the effect that is to be given to the executive order of May 31, 1921. It is to be noted, however, that defendants did not consider that executive order as authorizing the Secretary of the Interior to make the contracts and leases in suit. Attention has already been called to the demand of the defendants, at the time that the initial and paramount contract of April 25, 1922, was about to be signed, that the Secretary of the Navy must sign this contract. There apparently had been no intention on the part of Secretary Fall, Admiral Robison, or any other official of the government that any one but the Secretary of the Interior would be required to sign the contract on behalf of the government.

[27, 28] If the executive order of May 31, 1921, purports to confer upon the Sec-retary of the Interior the authority which Congress had lodged exclusively in the Secretary of the Navy, it is, in my opinion, void to that extent. The President in peace time could not even, under his powerful and extensive general executive authority, transfer from one member of his Cabinet to another member of his Cabinet powers and duties that had been conferred by the Congress on a specified Cabinet officer, that call for the exercise of discretion by the Cabinet officer from whom such power is attempted to be transferred. In so far as systematizing, co-ordinating, and facilitating the conduct of the executive departments of government are concerned the President could lawfully transfer duties between Cabinet officers; but the transfer attempted by the executive order of May 31, 1921, goes much further.

The office of Secretary of the Navy was created by act of Congress, and the Congress under the Constitution is given sole power to provide and maintain a Navy. The administration and conservation of the naval petroleum reserves comes within the power conferred by the people upon Congress alone, and in delegating certain and specific powers and rights to the Secretary of the Navy with respect to the naval petroleum reserves, which call for the exercise of such officer's discretion, it must be held that Congress did not intend that some other branch of the government could transfer this power to some other officer, or divest the officer in whom Congress reposed the authority of the power which Congress has conferred upon such officer exclusively. No branch of the government but Congress can divest or transfer the power so delegated. Even the Secretary of the Navy himself cannot delegate or transfer essentially discretionary powers concerning the naval petroleum reserves, which have been reposed in him exclusively by the Congress. He may, with the approval of the President, establish regulations in execution of, or supplementary to, but not in conflict with, the statutes defining his powers. United States v. Symonds, 120 U. S. 49, 7 S. Ct. 411, 30 L. Ed. 557.

[29] The leases of June 5, 1922, and December 11, 1922, give the Secretary of the Interior sole authority to oversee the progress of the work upon the leased area, requiring for this purpose the submission to him of plats showing such work, and of sale contracts with respect to the disposal of the oil and gas produced under the leases. The Secretary of the Interior is

further expressly given the sole right to permit suspension of work under the leases, and also the sole right to authorize, sanction, or permit any assignment or subleasing, as well as full exclusive authority to terminate or surrender the lease. It is his, and not the Secretary of the Navy's discretion that settles and determines such matters.

By the two contracts the Secretary of the Interior solely is also given vital and extensive powers requiring the exercise of discretion. Among these is the right to grant additional leases on such lands in the naval oil reserves as he may designate if he shall determine that the royalty oil from the reserves diminishes so that the Pearl Harbor contract will be unduly prolonged. And article XI of the contract of April 25, 1922, confers solely upon the Secretary of the Interior complete authority and power to determine when and upon what terms townships 30 and 31 south, range 24 east M. D. M., of reserve No. 1, may be leased to the defendants. The December 11 contract reiterates and reestablishes the right of the Secretary of the Interior to determine how and when the defendant may exercise its valuable preferential right, conferred by article XI of the contract of April 25, and also vests the Secretary of the Interior with sole power to direct the defendant to fill the storage tanks at Pearl Harbor with fuel oil. Other instances of the delegations of vital power to the Secretary of the Interior are found in the specifications, which accompany each of the contracts and are part of them. It is unnecessary to specifically mention them here. Suffice it to say that these powers are so important, necessary, and essential to the agreements that, if they are eliminated, the essence and vitality of the entire plan of the contracts and leases is gone.

These delegated powers are not merely incidental to any power retained by the Secretary of the Navy. They are not purely ministerial or administrative. They are in fact the principal controlling powers that the Act of June 4, 1920, vests exclusively in the Secretary of the Navy, so that he, and he only, can control and administer these reserves for the benefit of the Navy and of the United States. The delegated powers require the Secretary of the Interior to exercise judgment and discretion, and the attempted transfer of such powers from the Secretary of the Navy renders the contracts and leases void. Mechem on Public Officers, §§ 567, 568, 604; 1 McQuillin on Municipal Corporations, 839.

There is no merit in the contention of defendants that the Secretary of the Interior is merely made the agent of the Secretary of the Navy by these provisions of the contracts in which the delegations of powers are found. The authority is conferred on the Secretary of the Interior sui juris, and not as the representative of the Secretary of the Navy.

I conclude this opinion by summarizing my decision of this case as follows:

The plaintiff is entitled to the cancellation and annulment of each of the contracts and leases in controversy by reason of fraud and conspiracy of Secretary Fall and Mr. Doheny, as alleged in the amended bill of complaint, and also because each of said contracts and leases is void on account of the illegal and invalid transfer and delegation of power from the Secretary of the Navy to the Secretary of the Interior, as shown by certain provisions in each of the contracts and leases. If it were not for the fraud and conspiracy of Secretary Fall and Mr. Doheny, and the unlawful delegation of power in the agreements, the contracts and leases in suit would be authorized, and would be binding obligations upon the United States of America, under the Act of June 4, 1920.

[30] The record in this case, however, does not entitle the plaintiff to the full relief demanded by the amended bill, and, although plaintiff makes no offer to do equity in the premises, this court nevertheless, in a suit of this kind, has the inherent power to administer equity between the parties commensurate with the special circumstances and conditions of the case. 5 Pomeroy's Equity Jurisprudence, § 2110; Plews v. Burrage (C. C. A.) 274 F. 881; Twin Lakes L. & W. Co. v. Dohner, 242 F. 399, 155 C. C. A. 175; Knappen v. Freeman, 47 Minn. 491, 50 N. W. 533.

[31] The evidence proves that there has been constructed and completed under the direction of the defendants at Pearl Harbor, Hawaii, all of the fuel oil storage facilities mentioned in the contract of April 25, 1922, and that there has also been constructed and completed under the direction of the defendants at Pearl Harbor, Hawaii, much of the additional storage facilities for crude oil products mentioned in the contract of December 11, 1922, and it has been clearly established that such construction projects and property are of benefit

and value to the United States of America and to its Navy, and that the construction of such property has been done economically and without waste or extravagance, and that such constructed facilities are now available for use by the United States of America, and are now located on property of the government at Pearl Harbor, Hawaii, and that the money expended for the construction and completion of said storage facilities for crude oil products at Pearl Harbor, Hawaii, has been expended by defendants upon property of the United States of America and under the supervision and inspection of the duly appointed officers of the United States Navy.

Such property should be retained by the plaintiff, and the defendants are entitled to be credited with and to receive payment from the plaintiff for the cost price of the storage facilities for crude oil products completed and installed at Pearl Harbor, Hawaii, together with the cost price of such fuel oil contents thereof as have been to the date hereof placed within said storage facilities at Pearl Harbor, Hawaii, under the supervision of officers of the United States Navy. The plaintiff will also be required to pay or to credit the defendants with such money as has been actually expended in drilling and putting on production any wells drilled under the lease of June 5, 1922, or the lease of December 11, 1922.

During the pendency of this action the lands within the naval petroleum reserves in controversy have been controlled, managed, and operated by receivers of this court, Rear Admiral Harry H. Rousseau, C. E. C., U. S. N., and Mr. J. Crampton Anderson, in an unusually efficient and economical manner. Production of oil therein has been curtailed to the fullest extent consistent with offset and defensive requirements, and there has been a cessation of drilling on the land in controversy, except where drilling was imperative. It is necessary that such defensive activities be continued at least until the entry of final decree herein, and the receivership will therefore continue until further order of the court.

In order to carry out the terms of this decision, a special master in chancery will be appointed pro hac vice. Special counsel and solicitors for plaintiff will prepare a decree pursuant to the findings of fact and conclusions of law which I have filed with this opinion and under the rules of this court.